# MITCHELL *v.* UNITED STATES

No. 97–7541.   Argued December 9, 1998—Decided April 5, 1999

KENNEDY, J., delivered the opinion of the Court, in which STEVENS, SOUTER, GINSBURG, and BREYER, JJ., joined. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., and O'CONNOR and THOMAS, JJ., joined, *post*, p. 331. THOMAS, J., filed a dissenting opinion, *post*, p. 341.

*Steven A. Morley*, by appointment of the Court, 525 U. S. 806, argued the cause for petitioner. With him on the briefs was *Jeffrey T. Green*.

*Deputy Solicitor General Dreeben* argued the cause for the United States. With him on the brief were *Solicitor General Waxman, Assistant Attorney General Robinson, Barbara McDowell*, and *Joel M. Gershowitz.**

JUSTICE KENNEDY delivered the opinion of the Court.

Two questions relating to a criminal defendant's Fifth Amendment privilege against self-incrimination are presented to us. The first is whether, in the federal criminal system, a guilty plea waives the privilege in the sentencing phase of the case, either as a result of the colloquy preceding the plea or by operation of law when the plea is entered. We hold the plea is not a waiver of the privilege at sentencing. The second question is whether, in determining facts

---

**Peter Goldberger, Lisa Bondareff Kemler*, and *Kyle O'Dowd* filed a brief for the National Association of Criminal Defense Lawyers et al. as *amici curiae* urging reversal.

about the crime which bear upon the severity of the sentence, a trial court may draw an adverse inference from the defendant's silence. We hold a sentencing court may not draw the adverse inference.

I

Petitioner Amanda Mitchell and 22 other defendants were indicted for offenses arising from a conspiracy to distribute cocaine in Allentown, Pennsylvania, from 1989 to 1994. According to the indictment, the leader of the conspiracy, Harry Riddick, obtained large quantities of cocaine and resold the drug through couriers and street sellers, including petitioner. Petitioner was charged with one count of conspiring to distribute five or more kilograms of cocaine, in violation of 21 U. S. C. §846, and with three counts of distributing cocaine within 1,000 feet of a school or playground, in violation of §860(a). In 1995, without any plea agreement, petitioner pleaded guilty to all four counts. She reserved the right to contest the drug quantity attributable to her under the conspiracy count, and the District Court advised her the drug quantity would be determined at her sentencing hearing.

Before accepting the plea, the District Court made the inquiries required by Rule 11 of the Federal Rules of Criminal Procedure. Informing petitioner of the penalties for her offenses, the District Judge advised her, "the range of punishment here is very complex because we don't know how much cocaine the Government's going to be able to show you were involved in." App. 39. The judge told petitioner she faced a mandatory minimum of one year in prison under §860 for distributing cocaine near a school or playground. She also faced "serious punishment depending on the quantity involved" for the conspiracy, with a mandatory minimum of 10 years in prison under §841 if she could be held responsible for at least 5 kilograms but less than 15 kilograms of cocaine. *Id.*, at 42. By pleading guilty, the District Court explained,

petitioner would waive various rights, including "the right at trial to remain silent under the Fifth Amendment." *Id.,* at 45.

After the Government explained the factual basis for the charges, the judge, having put petitioner under oath, asked her, "Did you do that?" Petitioner answered, "Some of it." *Id.,* at 47. She indicated that, although present for one of the transactions charged as a substantive cocaine distribution count, she had not herself delivered the cocaine to the customer. The Government maintained she was liable nevertheless as an aider and abettor of the delivery by another courier. After discussion with her counsel, petitioner reaffirmed her intention to plead guilty to all the charges. The District Court noted she might have a defense to one count on the theory that she was present but did not aid or abet the transaction. Petitioner again confirmed her intention to plead guilty, and the District Court accepted the plea.

In 1996, 9 of petitioner's original 22 codefendants went to trial. Three other codefendants had pleaded guilty and agreed to cooperate with the Government. They testified petitioner was a regular seller for ringleader Riddick. At petitioner's sentencing hearing, the three adopted their trial testimony, and one of them furnished additional information on the amount of cocaine petitioner sold. According to him, petitioner worked two to three times a week, selling 1½ to 2 ounces of cocaine a day, from April 1992 to August 1992. Then, from August 1992 to December 1993 she worked three to five times a week, and from January 1994 to March 1994 she was one of those in charge of cocaine distribution for Riddick. On cross-examination, the codefendant conceded he had not seen petitioner on a regular basis during the relevant period.

Both petitioner and the Government referred to trial testimony by one Alvitta Mack, who had made a series of drug buys under the supervision of law enforcement agents, including three purchases from petitioner totaling two ounces

of cocaine in 1992. Petitioner put on no evidence at sentencing, nor did she testify to rebut the Government's evidence about drug quantity. Her counsel argued, however, that the three documented sales to Mack constituted the only evidence of sufficient reliability to be credited in determining the quantity of cocaine attributable to her for sentencing purposes.

After this testimony at the sentencing hearing the District Court ruled that, as a consequence of her guilty plea, petitioner had no right to remain silent with respect to the details of her crimes. The court found credible the testimony indicating petitioner had been a drug courier on a regular basis. Sales of 1½ to 2 ounces twice a week for a year and a half put her over the 5-kilogram threshold, thus mandating a minimum sentence of 10 years. "One of the things" persuading the court to rely on the testimony of the codefendants was petitioner's "not testifying to the contrary." *Id.*, at 95.

The District Judge told petitioner:

> "'I held it against you that you didn't come forward today and tell me that you really only did this a couple of times. . . . I'm taking the position that you should come forward and explain your side of this issue.
>
> "'Your counsel's taking the position that you have a Fifth Amendment right not to. . . . If he's—if it's determined by a higher Court that he's right in that regard, I would be willing to bring you back for resentencing. And if you—if—and then I might take a closer look at the [codefendants'] testimony.'" *Id.*, at 98–99.

The District Court sentenced petitioner to the statutory minimum of 10 years of imprisonment, 6 years of supervised release, and a special assessment of $200.

The Court of Appeals for the Third Circuit affirmed the sentence. 122 F. 3d 185 (1997). According to the Court of Appeals: "By voluntarily and knowingly pleading guilty to

the offense Mitchell waived her Fifth Amendment privilege." *Id.*, at 189. The court acknowledged other Circuits have held a witness can "claim the Fifth Amendment privilege if his or her testimony might be used to enhance his or her sentence," *id.*, at 190 (citing *United States* v. *Garcia,* 78 F. 3d 1457, 1463, and n. 8 (CA10), cert. denied, 517 U. S. 1239 (1996)), but it said this rule "does not withstand analysis," 122 F. 3d, at 191. The court thought it would be illogical to "fragment the sentencing process," retaining the privilege against self-incrimination as to one or more components of the crime while waiving it as to others. *Ibid.* Petitioner's reservation of the right to contest the amount of drugs attributable to her did not change the court's analysis. In the Court of Appeals' view:

> "Mitchell opened herself up to the full range of possible sentences for distributing cocaine when she was told during her plea colloquy that the penalty for conspiring to distribute cocaine had a maximum of life imprisonment. While her reservation may have put the government to its proof as to the amount of drugs, her declination to testify on that issue could properly be held against her." *Ibid.*

The court acknowledged a defendant may plead guilty and retain the privilege with respect to other crimes, but it observed: "Mitchell does not claim that she could be implicated in other crimes by testifying at her sentencing hearing, nor could she be retried by the state for the same offense." *Ibid.* (citing 18 Pa. Cons. Stat. § 111 (1998), a statute that bars, with certain exceptions, a state prosecution following a federal conviction based on the same conduct).

Judge Michel concurred, reasoning that any error by the District Court in drawing an adverse factual inference from petitioner's silence was harmless because "the evidence amply supported [the judge's] finding on quantity" even with-

out consideration of petitioner's failure to testify. 122 F. 3d, at 192.

Other Circuits to have confronted the issue have held that a defendant retains the privilege at sentencing. See, *e. g.*, *United States* v. *Kuku,* 129 F. 3d 1435, 1437–1438 (CA11 1997); *United States* v. *Garcia,* 78 F. 3d 1457, 1463 (CA10 1996); *United States* v. *De La Cruz,* 996 F. 2d 1307, 1312–1313 (CA1 1993); *United States* v. *Hernandez,* 962 F. 2d 1152, 1161 (CA5 1992); *Bank One of Cleveland, N. A.* v. *Abbe,* 916 F. 2d 1067, 1075–1076 (CA6 1990); *United States* v. *Lugg,* 892 F. 2d 101, 102–103 (CADC 1989); *United States* v. *Paris,* 827 F. 2d 395, 398–399 (CA9 1987). We granted certiorari to resolve the apparent Circuit conflict created by the Court of Appeals' decision, 524 U. S. 925 (1998), and we now reverse.

## II

The Government maintains that petitioner's guilty plea was a waiver of the privilege against compelled self-incrimination with respect to all the crimes comprehended in the plea. We hold otherwise and rule that petitioner retained the privilege at her sentencing hearing.

## A

It is well established that a witness, in a single proceeding, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details. See *Rogers* v. *United States,* 340 U. S. 367, 373 (1951). The privilege is waived for the matters to which the witness testifies, and the scope of the "waiver is determined by the scope of relevant cross-examination," *Brown* v. *United States,* 356 U. S. 148, 154–155 (1958). "The witness himself, certainly if he is a party, determines the area of disclosure and therefore of inquiry," *id.,* at 155. Nice questions will arise, of course, about the extent of the initial testimony and whether the ensuing questions are compre-

hended within its scope, but for now it suffices to note the general rule.

The justifications for the rule of waiver in the testimonial context are evident: A witness may not pick and choose what aspects of a particular subject to discuss without casting doubt on the trustworthiness of the statements and diminishing the integrity of the factual inquiry. As noted in *Rogers*, a contrary rule "would open the way to distortion of facts by permitting a witness to select any stopping place in the testimony," 340 U. S., at 371. It would, as we said in *Brown*, "make of the Fifth Amendment not only a humane safeguard against judicially coerced self-disclosure but a positive invitation to mutilate the truth a party offers to tell," 356 U. S., at 156. The illogic of allowing a witness to offer only self-selected testimony should be obvious even to the witness, so there is no unfairness in allowing cross-examination when testimony is given without invoking the privilege.

We may assume for purposes of this opinion, then, that if petitioner had pleaded not guilty and, having taken the stand at a trial, testified she did "some of it," she could have been cross-examined on the frequency of her drug deliveries and the quantity of cocaine involved. The concerns which justify the cross-examination when the defendant testifies are absent at a plea colloquy, however. The purpose of a plea colloquy is to protect the defendant from an unintelligent or involuntary plea. The Government would turn this constitutional shield into a prosecutorial sword by having the defendant relinquish all rights against compelled self-incrimination upon entry of a guilty plea, including the right to remain silent at sentencing.

There is no convincing reason why the narrow inquiry at the plea colloquy should entail such an extensive waiver of the privilege. Unlike the defendant taking the stand, who "cannot reasonably claim that the Fifth Amendment gives him . . . an immunity from cross-examination on the matters

he has himself put in dispute," *id.*, at 155–156, the defendant who pleads guilty puts nothing in dispute regarding the essentials of the offense. Rather, the defendant takes those matters out of dispute, often by making a joint statement with the prosecution or confirming the prosecution's version of the facts. Under these circumstances, there is little danger that the court will be misled by selective disclosure. In this respect a guilty plea is more like an offer to stipulate than a decision to take the stand. Here, petitioner's statement that she had done "some of" the proffered conduct did not pose a threat to the integrity of factfinding proceedings, for the purpose of the District Court's inquiry was simply to ensure that petitioner understood the charges and that there was a factual basis for the Government's case.

Nor does Federal Rule of Criminal Procedure 11, which governs pleas, contemplate the broad waiver the Government envisions. Rule 11 directs the district court, before accepting a guilty plea, to ascertain the defendant understands he or she is giving up "the right to be tried by a jury and at that trial . . . the right against compelled self-incrimination." Rule 11(c)(3). The transcript of the plea colloquy in this case discloses that the District Court took care to comply with this and the other provisions of Rule 11. The District Court correctly instructed petitioner: "You have the right at trial to remain silent under the Fifth Amendment, or at your option, you can take the stand and tell the jury your side of this controversy. . . . If you plead guilty, all of those rights are gone." App. 45.

Neither the Rule itself nor the District Court's explication of it indicates that the defendant consents to take the stand in the sentencing phase or to suffer adverse consequences from declining to do so. Both the Rule and the District Court's admonition were to the effect that by entry of the plea petitioner would surrender the right "at trial" to invoke the privilege. As there was to be no trial, the warning would not have brought home to petitioner that she was also

waiving the right to self-incrimination at sentencing. The purpose of Rule 11 is to inform the defendant of what she loses by forgoing the trial, not to elicit a waiver of the privilege for proceedings still to follow. A waiver of a right to trial with its attendant privileges is not a waiver of the privileges which exist beyond the confines of the trial.

Of course, a court may discharge its duty of ensuring a factual basis for a plea by "question[ing] the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant has pleaded." Rule 11(c)(5). We do not question the authority of a district court to make whatever inquiry it deems necessary in its sound discretion to assure itself the defendant is not being pressured to offer a plea for which there is no factual basis. A defendant who withholds information by invoking the privilege against self-incrimination at a plea colloquy runs the risk the district court will find the factual basis inadequate. At least once the plea has been accepted, statements or admissions made during the preceding plea colloquy are later admissible against the defendant, as is the plea itself. A statement admissible against a defendant, however, is not necessarily a waiver of the privilege against self-incrimination. Rule 11 does not prevent the defendant from relying upon the privilege at sentencing.

Treating a guilty plea as a waiver of the privilege at sentencing would be a grave encroachment on the rights of defendants. At oral argument, we asked counsel for the United States whether, on the facts of this case, if the Government had no reliable evidence of the amount of drugs involved, the prosecutor "could say, well, we can't prove it, but we'd like to put her on the stand and cross-examine her and see if we can't get her to admit it." Tr. of Oral Arg. 45. Counsel answered: "[T]he waiver analysis that we have put forward suggests that at least as to the facts surrounding the conspiracy to which she admitted, the Government could do that." *Ibid.* Over 90% of federal criminal defendants

whose cases are not dismissed enter pleas of guilty or *nolo contendere.* U. S. Dept. of Justice, Bureau of Justice Statistics, Sourcebook of Criminal Justice Statistics 1996, p. 448 (24th ed. 1997). Were we to accept the Government's position, prosecutors could indict without specifying the quantity of drugs involved, obtain a guilty plea, and then put the defendant on the stand at sentencing to fill in the drug quantity. The result would be to enlist the defendant as an instrument in his or her own condemnation, undermining the long tradition and vital principle that criminal proceedings rely on accusations proved by the Government, not on inquisitions conducted to enhance its own prosecutorial power. *Rogers* v. *Richmond,* 365 U. S. 534, 541 (1961) ("[O]urs is an accusatorial and not an inquisitorial system").

We reject the position that either petitioner's guilty plea or her statements at the plea colloquy functioned as a waiver of her right to remain silent at sentencing.

### B

The centerpiece of the Third Circuit's opinion is the idea that the entry of the guilty plea completes the incrimination of the defendant, thus extinguishing the privilege. Where a sentence has yet to be imposed, however, this Court has already rejected the proposition that "'incrimination is complete once guilt has been adjudicated,'" *Estelle* v. *Smith,* 451 U. S. 454, 462 (1981), and we reject it again today.

The Court of Appeals cited Wigmore on Evidence for the proposition that upon conviction "'criminality ceases; and with criminality the privilege.'" 122 F. 3d, at 191 (citing 8 J. Wigmore, Evidence §2279, p. 481 (J. McNaughton rev. 1961)). The passage relied upon does not support the Third Circuit's narrow view of the privilege. The full passage is as follows: "Legal criminality consists in liability to the law's punishment. When that liability is removed, criminality ceases; and with the criminality the privilege." *Ibid.* It could be argued that liability for punishment continues until

sentence has been imposed, and so does the privilege. Even if the Court of Appeals' interpretation of the treatise were correct, however, and it means the privilege ceases upon conviction but before sentencing, we would respond that the suggested rule is simply wrong. A later supplement to the treatise, indeed, states the proper rule that, "[a]lthough the witness has pleaded guilty to a crime charged but has not been sentenced, his constitutional privilege remains unimpaired." J. Wigmore, Evidence §2279, p. 991, n. 1 (A. Best ed. Supp. 1998).

It is true, as a general rule, that where there can be no further incrimination, there is no basis for the assertion of the privilege. We conclude that principle applies to cases in which the sentence has been fixed and the judgment of conviction has become final. See, e. g., *Reina* v. *United States*, 364 U. S. 507, 513 (1960). If no adverse consequences can be visited upon the convicted person by reason of further testimony, then there is no further incrimination to be feared.

Where the sentence has not yet been imposed a defendant may have a legitimate fear of adverse consequences from further testimony. As the Court stated in *Estelle:* "Any effort by the State to compel [the defendant] to testify against his will at the sentencing hearing clearly would contravene the Fifth Amendment." 451 U. S., at 463. *Estelle* was a capital case, but we find no reason not to apply the principle to noncapital sentencing hearings as well. "The essence of this basic constitutional principle is 'the requirement that the State which proposes to convict *and punish* an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips.'" *Id.*, at 462 (emphasis in original) (quoting *Culombe* v. *Connecticut*, 367 U. S. 568, 581–582 (1961)). The Government itself makes the implicit concession that the acceptance of a guilty plea does not eliminate the possibility of further incrimination. In its brief to the Court, the Gov-

ernment acknowledges that a defendant who awaits sentencing after having pleaded guilty may assert the privilege against self-incrimination if called as a witness in the trial of a codefendant, in part because of the danger of responding "to questions that might have an adverse impact on his sentence or on his prosecution for other crimes." Brief for United States 31.

The Fifth Amendment by its terms prevents a person from being "compelled in any criminal case to be a witness against himself." U. S. Const., Amdt. 5. To maintain that sentencing proceedings are not part of "any criminal case" is contrary to the law and to common sense. As to the law, under the Federal Rules of Criminal Procedure, a court must impose sentence before a judgment of conviction can issue. See Rule 32(d)(1) ("A judgment of conviction must set forth the plea ... and the sentence"); cf. *Mempa* v. *Rhay*, 389 U. S. 128, 134 (1967). As to common sense, it appears that in this case, as is often true in the criminal justice system, the defendant was less concerned with the proof of her guilt or innocence than with the severity of her punishment. Petitioner faced imprisonment from one year upwards to life, depending on the circumstances of the crime. To say that she had no right to remain silent but instead could be compelled to cooperate in the deprivation of her liberty would ignore the Fifth Amendment privilege at the precise stage where, from her point of view, it was most important. Our rule is applicable whether or not the sentencing hearing is deemed a proceeding separate from the Rule 11 hearing, an issue we need not resolve.

### III

The Government suggests in a footnote that even if petitioner retained an unwaived privilege against self-incrimination in the sentencing phase of her case, the District Court was entitled, based on her silence, to draw an adverse inference with regard to the amount of drugs attributable to her. Brief for United States 31–32, n. 18. The

normal rule in a criminal case is that no negative inference from the defendant's failure to testify is permitted. *Griffin v. California,* 380 U. S. 609, 614 (1965). We decline to adopt an exception for the sentencing phase of a criminal case with regard to factual determinations respecting the circumstances and details of the crime.

This Court has recognized "the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them," *Baxter v. Palmigiano,* 425 U. S. 308, 318 (1976), at least where refusal to waive the privilege does not lead "automatically and without more to [the] imposition of sanctions," *Lefkowitz* v. *Cunningham,* 431 U. S. 801, 808, n. 5 (1977). In ordinary civil cases, the party confronted with the invocation of the privilege by the opposing side has no capacity to avoid it, say, by offering immunity from prosecution. The rule allowing invocation of the privilege, though at the risk of suffering an adverse inference or even a default, accommodates the right not to be a witness against oneself while still permitting civil litigation to proceed. Another reason for treating civil and criminal cases differently is that "the stakes are higher" in criminal cases, where liberty or even life may be at stake, and where the government's "sole interest is to convict." *Baxter,* 425 U. S., at 318–319.

*Baxter* itself involved state prison disciplinary proceedings which, as the Court noted, "are not criminal proceedings" and "involve the correctional process and important state interests other than conviction for crime." *Id.,* at 316, 319. Cf. *Ohio Adult Parole Authority* v. *Woodard,* 523 U. S. 272 (1998) (adverse inference permissible from silence in clemency proceeding, a nonjudicial postconviction process which is not part of the criminal case). Unlike a prison disciplinary proceeding, a sentencing hearing is part of the criminal case—the explicit concern of the self-incrimination privilege. In accordance with the text of the Fifth Amendment, we

must accord the privilege the same protection in the sentencing phase of "any criminal case" as that which is due in the trial phase of the same case, see *Griffin, supra.*

The concerns which mandate the rule against negative inferences at a criminal trial apply with equal force at sentencing. Without question, the stakes are high: Here, the inference drawn by the District Court from petitioner's silence may have resulted in decades of added imprisonment. The Government often has a motive to demand a severe sentence, so the central purpose of the privilege—to protect a defendant from being the unwilling instrument of his or her own condemnation—remains of vital importance.

Our holding today is a product of existing precedent, not only *Griffin* but also by *Estelle* v. *Smith,* in which the Court could "discern no basis to distinguish between the guilt and penalty phases of respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned." 451 U. S., at 462–463. Although *Estelle* was a capital case, its reasoning applies with full force here, where the Government seeks to use petitioner's silence to infer commission of disputed criminal acts. See *supra,* at 326. To say that an adverse factual inference may be drawn from silence at a sentencing hearing held to determine the specifics of the crime is to confine *Griffin* by ignoring *Estelle.* We are unwilling to truncate our precedents in this way.

The rule against adverse inferences from a defendant's silence in criminal proceedings, including sentencing, is of proven utility. Some years ago the Court expressed concern that "[t]oo many, even those who should be better advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are either guilty of crime or commit perjury in claiming the privilege." *Ullmann* v. *United States,* 350 U. S. 422, 426 (1956). Later, it quoted with apparent approval Wigmore's observation that "'[t]he layman's natural first suggestion would probably be that the resort to privilege in each instance is a clear confes-

sion of crime,'" *Lakeside* v. *Oregon*, 435 U. S. 333, 340, n. 10 (1978) (quoting 8 Wigmore, Evidence § 2272, at 426). It is far from clear that citizens, and jurors, remain today so skeptical of the principle or are often willing to ignore the prohibition against adverse inferences from silence. Principles once unsettled can find general and wide acceptance in the legal culture, and there can be little doubt that the rule prohibiting an inference of guilt from a defendant's rightful silence has become an essential feature of our legal tradition. This process began even before *Griffin*. When *Griffin* was being considered by this Court, some 44 States did not allow a prosecutor to invite the jury to make an adverse inference from the defendant's refusal to testify at trial. See *Griffin*, *supra*, at 611, n. 3. The rule against adverse inferences is a vital instrument for teaching that the question in a criminal case is not whether the defendant committed the acts of which he is accused. The question is whether the Government has carried its burden to prove its allegations while respecting the defendant's individual rights. The Government retains the burden of proving facts relevant to the crime at the sentencing phase and cannot enlist the defendant in this process at the expense of the self-incrimination privilege. Whether silence bears upon the determination of a lack of remorse, or upon acceptance of responsibility for purposes of the downward adjustment provided in § 3E1.1 of the United States Sentencing Guidelines (1998), is a separate question. It is not before us, and we express no view on it.

By holding petitioner's silence against her in determining the facts of the offense at the sentencing hearing, the District Court imposed an impermissible burden on the exercise of the constitutional right against compelled self-incrimination. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom THE CHIEF JUSTICE, JUSTICE O'CONNOR, and JUSTICE THOMAS join, dissenting.

I agree with the Court that Mitchell had the right to invoke her Fifth Amendment privilege during the sentencing phase of her criminal case. In my view, however, she did not have the right to have the sentencer abstain from making the adverse inferences that reasonably flow from her failure to testify. I therefore respectfully dissent.

## I

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." As an original matter, it would seem to me that the threat of an adverse inference does not "compel" anyone to testify. It is one of the natural (and not governmentally imposed) consequences of failing to testify—as is the factfinder's increased readiness to believe the incriminating testimony that the defendant chooses not to contradict. Both of these consequences are assuredly cons rather than pros in the "to testify or not to testify" calculus, but they do not *compel* anyone to take the stand. Indeed, I imagine that in most instances, a guilty defendant would choose to remain silent *despite* the adverse inference, on the theory that it would do him less damage than his own cross-examined testimony.

Despite the text, we held in *Griffin* v. *California*, 380 U. S. 609, 614 (1965), that it was impermissible for the prosecutor or judge to comment on a defendant's refusal to testify. We called it a "penalty" imposed on the defendant's exercise of the privilege. *Ibid.* And we did not stop there, holding in *Carter* v. *Kentucky*, 450 U. S. 288 (1981), that a judge must, if the defendant asks, instruct the jury that it may not *sua sponte* consider the defendant's silence as evidence of his guilt.

The majority muses that the no-adverse-inference rule has found "wide acceptance in the legal culture" and has even

become "an essential feature of our legal tradition." *Ante,* at 330. Although the latter assertion strikes me as hyperbolic, the former may be true—which is adequate reason not to overrule these cases, a course I in no way propose. It is not adequate reason, however, to extend these cases into areas where they do not yet apply, since neither logic nor history can be marshaled in defense of them. The illogic of the *Griffin* line is plain, for it runs exactly counter to normal evidentiary inferences: If I ask my son whether he saw a movie I had forbidden him to watch, and he remains silent, the import of his silence is clear. Indeed, we have on other occasions recognized the significance of silence, saying that " '[f]ailure to contest an assertion . . . is considered evidence of acquiescence . . . if it would have been natural under the circumstances to object to the assertion in question.' " *Baxter* v. *Palmigiano,* 425 U. S. 308, 319 (1976) (quoting *United States* v. *Hale,* 422 U. S. 171, 176 (1975)). See also *United States ex rel. Bilokumsky* v. *Tod,* 263 U. S. 149, 153–154 (1923) ("Conduct which forms a basis for inference is evidence. Silence is often evidence of the most persuasive character").

And as for history, *Griffin*'s pedigree is equally dubious. The question whether a factfinder may draw a logical inference from a criminal defendant's failure to offer formal testimony would not have arisen in 1791, because common-law evidentiary rules prevented a criminal defendant from testifying in his own behalf even if he wanted to do so. See generally *Ferguson* v. *Georgia,* 365 U. S. 570 (1961). That is not to say, however, that a criminal defendant was not allowed to *speak* in his own behalf, and a tradition of expecting the defendant to do so, and of drawing an adverse inference when he did not, strongly suggests that *Griffin* is out of sync with the historical understanding of the Fifth Amendment. Traditionally, defendants were expected to speak rather extensively at both the pretrial and trial stages of a criminal proceeding. The longstanding common-law principle, *nemo*

*tenetur seipsum prodere,* was thought to ban only testimony forced by compulsory oath or physical torture, not voluntary, unsworn testimony. See T. Barlow, The Justice of Peace: A Treatise Containing the Power and Duty of That Magistrate 189–190 (1745).

Pretrial procedure in colonial America was governed (as it had been for centuries in England) by the Marian Committal Statute, which provided:

> "[S]uch Justices or Justice [of the peace] before whom any person shall be brought for Manslaughter or Felony, or for suspicion thereof, before he or they shall commit or send such Prisoner to Ward, shall take the examination of such Prisoner, and information of those that bring him, of the fact and circumstance thereof, and the same or as much thereof as shall be material to prove the Felony shall put in writing, within two days after the said examination. . . ." 2 & 3 Philip & Mary, ch. 10 (1555).

The justice of the peace testified at trial as to the content of the defendant's statement; if the defendant refused to speak, this would also have been reported to the jury. Langbein, The Privilege and Common Law Criminal Procedure, in The Privilege Against Self-Incrimination 82, 92 (R. Helmholz et al. eds. 1997).

At trial, defendants were expected to speak directly to the jury. Sir James Stephen described 17th- and 18th-century English trials as follows:

> "[T]he prisoner in cases of felony could not be defended by counsel, and had therefore to speak for himself. He was thus unable to say . . . that his mouth was closed. On the contrary his mouth was not only open, but the evidence given against him operated as so much indirect questioning, and if he omitted to answer the questions it suggested he was very likely to be convicted." J. Ste-

phen, 1 History of the Criminal Law of England 440
(1883).

See also J. Beattie, Crime and the Courts in England: 1660–
1800, pp. 348–349 (1986) ("And the assumption was clear that
if the case against him was false the prisoner ought to say
so and suggest why, and that if he did not speak that could
only be because he was unable to deny the truth of the evi-
dence"); 2 W. Hawkins, Pleas of the Crown, ch. 39, § 2 (8th
ed. 1824) (confirming that defendants were expected to speak
in their own defense at trial). Though it is clear that ad-
verse inference from silence was permitted, I have been un-
able to find any case adverting to that inference in upholding
a conviction—which suggests that defendants rarely thought
it in their interest to remain silent. See Langbein, *supra*,
at 95–96.

No one, however, seemed to think this system inconsistent
with the principle of *nemo tenetur seipsum prodere*. And
there is no indication whatever that criminal procedure in
America made an abrupt about-face when this principle was
ratified as a fundamental right in the Fifth Amendment and
its state-constitution analogues. See Moglen, The Privilege
in British North America: The Colonial Period to the Fifth
Amendment, in The Privilege Against Self-Incrimination,
*supra*, at 139–140. Justices of the peace continued pretrial
questioning of suspects, whose silence continued to be intro-
duced against them at trial. See, *e. g.*, Fourth Report of the
Commissioners on Practice and Pleadings in New York—
Code of Criminal Procedure xxviii (1849); 1 Complete Works
of Edward Livingston on Criminal Jurisprudence 356 (1873).
If any objection was raised to the pretrial procedure, it was
on the purely statutory ground that the Marian Committal
Statute had no force in the new Republic. See, *e. g.*, W. Hen-
ing, The Virginia Justice: Comprising the Office and Author-
ity of a Justice of the Peace 285 (4th ed. 1825). And defend-
ants continued to speak at their trials until the assistance
of counsel became more common, which occurred gradually

throughout the 19th century. See W. Beaney, The Right to Counsel in American Courts 226 (1955).

The *Griffin* question did not arise until States began enacting statutes providing that criminal defendants were competent to testify under oath on their own behalf. Maine was first in 1864, and the rest of the States and the Federal Government eventually followed. See 2 J. Wigmore, Evidence § 579 (3d ed. 1940). Although some of these statutes (including the federal statute, 18 U. S. C. § 3481) contained a clause cautioning that no negative inference should be drawn from the defendant's failure to testify, disagreement with this approach was sufficiently widespread that, as late as 1953, the Uniform Rules of Evidence drafted by the National Conference of Commissioners on Uniform State Laws provided that "[i]f an accused in a criminal action does not testify, counsel may comment upon [sic] accused's failure to testify, and the trier of fact may draw all reasonable inferences therefrom." Uniform Rule of Evidence 23(4). See also Model Code of Evidence Rule 201(3) (1942) (similar).

Whatever the merits of prohibiting adverse inferences as a legislative policy, see *ante*, at 329–330, the text and history of the Fifth Amendment give no indication that there is a federal *constitutional* prohibition on the use of the defendant's silence as demeanor evidence. Our hardy forebears, who thought of compulsion in terms of the rack and oaths forced by the power of law, would not have viewed the drawing of a commonsense inference as equivalent pressure. And it is implausible that the Americans of 1791, who were subject to adverse inferences for failing to give unsworn testimony, would have viewed an adverse inference for failing to give sworn testimony as a violation of the Fifth Amendment. Nor can it reasonably be argued that the new statutes somehow created a "revised" understanding of the Fifth Amendment that was incorporated into the Due Process Clause of the Fourteenth Amendment, since only nine States (and not the Federal Government) had enacted competency statutes

when the Fourteenth Amendment was adopted, and three of them did *not* prohibit adverse inferences from failure to testify.[1]

The Court's decision in *Griffin*, however, did not even pretend to be rooted in a historical understanding of the Fifth Amendment. Rather, in a breathtaking act of sorcery it simply transformed legislative policy into constitutional command, quoting a passage from an earlier opinion describing the benevolent purposes of 18 U. S. C. § 3481, and then decreeing, with literally nothing to support it: "If the words 'Fifth Amendment' are substituted for 'act' and for 'statute,' the spirit of the Self-Incrimination Clause is reflected." 380 U. S., at 613–614. Imagine what a Constitution we would have if this mode of exegesis were generally applied—if, for example, without any evidence to prove the point, the Court could simply say of all federal procedural statutes: "If the words 'Fifth Amendment' are substituted for 'act' and for 'statute,' the spirit of the Due Process Clause is reflected." To my mind, *Griffin* was a wrong turn—which is not cause enough to overrule it, but is cause enough to resist its extension.

## II

The Court asserts that it will not "adopt an exception" to *Griffin* for the sentencing phase of a criminal case. *Ante,* at 328. That characterization of what we are asked to do is evidently demanded, in the Court's view, by the very text of the Fifth Amendment: The phrase "any criminal case" *requires* us to "accord the privilege the same protection in the sentencing phase . . . as that which is due in the trial phase of the same case." *Ante,* at 329. That is demonstrably not so.

---

[1] The statutes prohibiting an adverse inference were: 1866 Mass. Acts, ch. 260; 1866 Vt. Laws No. 40; 1867 Nev. Stats., ch. XVIII; 1867 Ohio Leg. Acts 260; 1868 Conn. Laws, ch. XCVI; 1868 Minn. Laws, ch. LXX. The statutes not prohibiting an adverse inference were: 1864 Me. Acts, ch. 280; 1866 Cal. Stats., ch. DCXLIV; 1866 S. C. Acts No. 4780.

Our case law has long recognized a natural dichotomy between the guilt and penalty phases. The jury-trial right contained in the Sixth Amendment—whose guarantees apply "[i]n all criminal prosecutions," a term indistinguishable for present purposes from the Fifth Amendment's "in any criminal case"—does not apply at sentencing. *Spaziano* v. *Florida*, 468 U. S. 447, 462–463 (1984). Nor does the Sixth Amendment's guarantee of the defendant's right "to be confronted with the witnesses against him." (The sentencing judge may consider, for example, reports of probation officers and psychiatrists without affording any cross-examination.) See *Williams* v. *New York*, 337 U. S. 241, 252 (1949). Likewise inapplicable at sentencing is the requirement of the Due Process Clause that the prosecution prove the essential facts beyond a reasonable doubt. *McMillan* v. *Pennsylvania*, 477 U. S. 79, 92 (1986).

The Court asserts that refusing to apply *Griffin* would "truncate" our holding in *Estelle* v. *Smith*, 451 U. S. 454 (1981), that the Fifth Amendment applies to sentencing proceedings. *Id.*, at 462. With the contrary indications in our case law, however, it seems to me quite impossible to read *Estelle* as holding, not only that the Fifth Amendment applies to sentencing as to guilt, but also that it has precisely the same scope in both phases. Thus the question before us, fairly put, is not whether we will "truncate" *Estelle* or create an "exception" to *Griffin*, but whether we will, for the first time, extend *Griffin* beyond the guilt phase. For the answer to that question, one would normally look to the historical understanding of the "no adverse inference" constitutional practice. Since, as described in Part I, there was no such practice, history is of no help here, except to suggest that a mistakenly created constitutional right should not be expanded.

Consistency with other areas of our jurisprudence points in the same direction. We have permitted adverse inferences to be drawn from silence where the consequence is a

denial of clemency, see *Ohio Adult Parole Authority* v. *Woodard*, 523 U. S. 272, 285–286 (1998), the imposition of punishment for violation of prison rules, see *Baxter* v. *Palmigiano*, 425 U. S., at 318–319, and even deportation, see *INS* v. *Lopez-Mendoza*, 468 U. S. 1032, 1043–1044 (1984) (citing *United States ex rel. Bilokumsky* v. *Tod*, 263 U. S., at 153–154).[2] There is no reason why the increased punishment to which the defendant is exposed in the sentencing phase of a completed criminal trial should be treated differently—unless it is the theory that the guilt and sentencing phases form one inseparable "criminal case," which I have refuted above. Nor, I might add—despite the broad dicta that it quotes from *Estelle*—does the majority really believe that the guilt and sentencing phases are a unified whole, else it would not leave open the possibility that the acceptance-of-responsibility Sentencing Guideline escapes the ban on negative inferences. *Ante*, at 330.

Which brings me to the greatest—the most bizarre—inconsistency of all: the combination of the rule that the Court adopts today with the balance of our jurisprudence relating to sentencing in particular. "[C]ourts in this country and in England," we have said, have "practiced a policy under which a sentencing judge [can] exercise a wide discretion in the sources and types of evidence used to assist him in de-

---

[2] Even at trial, I might note, we have not held the "no adverse inference" rule to be absolute. One year after *Griffin* v. *California*, 380 U. S. 609 (1965), we did say in *Miranda* v. *Arizona*, 384 U. S. 436 (1966), that a defendant's postarrest silence could not be introduced as substantive evidence against him at trial. *Id.*, at 468, n. 37 (dictum). But we have also held that the Fifth Amendment permits a defendant to be impeached with his prearrest silence, *Jenkins* v. *Anderson*, 447 U. S. 231, 238 (1980), or postarrest silence, *Fletcher* v. *Weir*, 455 U. S. 603 (1982) *(per curiam)*, if he later takes the stand during his criminal trial; we have also recognized the vitality of our pre-*Griffin* rule that a testifying defendant may be impeached with his refusal to take the stand in a prior trial. *Jenkins*, *supra*, at 235–236, and n. 2 (recognizing vitality of *Raffel* v. *United States*, 271 U. S. 494 (1926)).

termining the kind and extent of punishment to be imposed within limits fixed by law." *Williams* v. *New York, supra,* at 246. "[A] sentencing judge 'may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.'" *Nichols* v. *United States,* 511 U. S. 738, 747 (1994) (quoting *United States* v. *Tucker,* 404 U. S. 443, 446 (1972)). "Few facts available to a sentencing judge," we have observed, "are more relevant to 'the likelihood that [a defendant] will transgress no more, the hope that he may respond to rehabilitative efforts to assist with a lawful future career, [and] the degree to which he does or does not deem himself at war with his society'" than a defendant's willingness to cooperate. *Roberts* v. *United States,* 445 U. S. 552, 558 (1980). See also 18 U. S. C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence"). Today's opinion states, in as inconspicuous a manner as possible at the very end of its analysis (one imagines that if the statement were delivered orally it would be spoken in a very low voice, and with the Court's hand over its mouth), that its holding applies only to inferences drawn from silence "in determining the facts of the offense." *Ante,* at 330. "Whether silence bears upon the determination of a lack of remorse, or upon acceptance of responsibility for purposes of the downward adjustment provided in § 3E1.1 of the United States Sentencing Guidelines (1998), is a separate question" on which the majority expresses no view. *Ibid.* Never mind that we have said before, albeit in dicta, that "[w]e doubt that a principled distinction may be drawn between 'enhancing' the punishment imposed upon the petitioner and denying him the 'leniency' he claims would be appropriate if he had cooperated." *Roberts, supra,* at 557, n. 4.

Of course the clutter swept under the rug by limiting the opinion to "determining facts of the offense" is not merely application of today's opinion to §3E1.1, but its application to *all* determinations of acceptance of responsibility, repentance, character, and future dangerousness, in both federal and state prosecutions—that is to say, to what is probably the *bulk* of what most sentencing is all about. If the Court ultimately decides—in the fullness of time and after a decent period of confusion in the lower courts—that the "no inference" rule is indeed *limited* to "determining facts of the offense," then we will have a system in which a state court *can* increase the sentence of a convicted drug possessor who refuses to say how many ounces he possessed—not because that suggests he possessed the larger amount (to make such an inference would be unconstitutional!) but because his refusal to cooperate suggests he is unrepentant. Apart from the fact that there is no logical basis for drawing such a line *within* the sentencing phase (whereas drawing a line between guilt and sentencing is entirely logical), the result produced provides new support for Mr. Bumble's renowned evaluation of the law. Its only sensible feature is that it will almost always be unenforceable, since it will ordinarily be impossible to tell whether the sentencer has used the silence for either purpose or for neither.

If, on the other hand, the Court ultimately decides—in the fullness of time and after a decent period of confusion in the lower courts—that the extension of *Griffin* announced today is *not* limited to "determining facts of the offense," then it will have created a system in which we give the sentencing judge access to all sorts of out-of-court evidence, including the most remote hearsay, concerning the character of the defendant, his prior misdeeds, his acceptance of responsibility and determination to mend his ways, but declare taboo the most obvious piece of firsthand evidence standing in front of the judge: the defendant's refusal to cooperate with

the court. Such a rule orders the judge to avert his eyes from the elephant in the courtroom when it is the judge's job to size up the elephant.

The patent inadequacy of *both* of these courses with regard to determining matters other than the "facts of the offense" is not finessed by simply resolving, for the time being, not to choose between them. Sooner or later the choice must be made, and the fact that both alternatives are unsatisfactory cries out that the Court's extension of *Griffin* is a mistake.

The Court asserts that the rule against adverse inferences from silence, even in sentencing proceedings, "is of proven utility." *Ante*, at 329. Significantly, however, the only utility it proceeds to describe—that it is a "vital instrument" for teaching jurors that "the question in a criminal case is not whether the defendant committed the acts of which he is accused," but rather "whether the Government has carried its burden to prove its allegations"—is a utility that has no bearing upon sentencing, or indeed even upon the usual sentenc*er*, which is a judge rather than a jury. *Ante*, at 330.

\* \* \*

Though the Fifth Amendment protects Mitchell from being compelled to take the stand, and also protects her, as we have held, from adverse inferences drawn from her silence at the guilt phase of the trial, there is no reason why it must also shield her from the natural and appropriate consequences of her uncooperativeness at the sentencing stage. I respectfully dissent.

JUSTICE THOMAS, dissenting.

JUSTICE SCALIA's dissenting opinion persuasively demonstrates that this Court's decision in *Griffin* v. *California*, 380 U. S. 609 (1965), lacks foundation in the Constitution's text, history, or logic. The vacuousness of *Griffin* supplies "cause enough to resist its extension." *Ante*, at 336. And, in my view, it also illustrates that *Griffin* and its progeny, in-

cluding *Carter* v. *Kentucky*, 450 U. S. 288 (1981), should be reexamined.

As JUSTICE SCALIA notes, the *"illogic* of the *Griffin* line is plain" and its historical "pedigree is equally dubious." *Ante*, at 332 (emphasis added). Not only does *Griffin* fail to withstand a proper constitutional analysis, it rests on an unsound assumption. *Griffin* relied partly on the premise that comments about a defendant's silence (and the inferences drawn therefrom) penalized the exercise of his Fifth Amendment privilege. See *Griffin, supra*, at 614; *Carter, supra*, at 301. As the dissenting Justices in *Griffin* rightly observed, such comments or inferences do not truly "penalize" a defendant. See 380 U. S., at 620–621 (opinion of Stewart, J., joined by White, J.) ("Exactly what the penalty imposed consists of is not clear"); *id.*, at 621 ("[T]he Court must be saying that the California constitutional provision places some other compulsion upon the defendant to incriminate himself, some compulsion which the Court does not describe and which I cannot readily perceive"). Prosecutorial comments on a defendant's decision to remain silent at trial surely impose no greater "penalty" on a defendant than threats to indict him on more serious charges if he chooses not to enter into a plea bargain—a practice that this Court previously has validated. See, *e. g., Bordenkircher* v. *Hayes*, 434 U. S. 357, 365 (1978) (finding no due process violation where plea negotiations "presented the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution"). Moreover, this so-called "penalty" lacks any constitutional significance, since the explicit constitutional guarantee has been fully honored—a defendant is not "compelled . . . to be a witness against himself," U. S. Const., Amdt. 5, merely because the jury has been told that it may draw an adverse inference from his failure to testify. See *Griffin, supra*, at 621 (Stewart, J., joined by White, J., dissenting) ("[C]omment by counsel and the court does not compel testimony by creating such an awareness" of a de-

fendant's decision not to testify); *Carter, supra,* at 306 (Powell, J., concurring) ("But nothing in the [Self-Incrimination] Clause requires that jurors not draw logical inferences when a defendant chooses not to explain incriminating circumstances").\* Therefore, at bottom, *Griffin* constitutionalizes a policy choice that a majority of the Court found desirable at the time. *Carter* compounded the error. This sort of undertaking is not an exercise in constitutional interpretation but an act of judicial willfulness that has no logical stopping point. See *Carter, supra,* at 310 (REHNQUIST, J., dissenting) ("Such Thomistic reasoning is now carried from the constitutional provision itself, to the *Griffin* case, to the present case, and where it will stop no one can know").

We have previously recognized that *stare decisis* is "at its weakest when we interpret the Constitution because our interpretation can be altered only by constitutional amendment or by overruling our prior decisions." *Agostini* v. *Felton,* 521 U. S. 203, 235 (1997). Given their indefensible foundations, I would be willing to reconsider *Griffin* and *Carter* in the appropriate case. For purposes of this case, which asks only whether the principle established in *Griffin* should be extended, I agree that the Fifth Amendment does not prohibit a sentencer from drawing an adverse inference from a defendant's failure to testify and, therefore, join JUSTICE SCALIA's dissent.

---

\*I also agree with JUSTICE SCALIA, *ante,* at 336, that *Griffin* improperly relied on a prior decision interpreting a federal statute to inform its resolution of a constitutional question—an error the Court later repeated in *Carter.* See *Griffin* v. *California,* 380 U. S. 609, 613–614 (1965); *Carter* v. *Kentucky,* 450 U. S. 288, 300–301, n. 16 (1981).