KELLY, J.
(dissenting). To the casual reader, the rationale for today’s majority decision may be elusive. After all, as the majority correctly notes, the case deals with law that has been relatively well-settled for close to thirty years: a potential criminal defendant does not have a Sixth Amendment right to counsel during identifications that occur before the initiation of adversarial judicial proceedings, such as a formal charge or preliminary hearing. Moore v Illinois, 434 US 220, 226-227; 98 S Ct 458; 54 L Ed 2d 424 (1977); People v Jackson, 391 Mich 323, 338; 217 NW2d 22 (1974); see also People v Cheatham, 453 Mich 1, 9 n 8; 551 NW2d 355 (1996), citing People v Wright, 441 Mich 140, 173; 490 NW2d 351 (1992) (RILEY, J., dissenting); Moran v Burbine, 475 US 412, 430; 106 S Ct 1135; 89 L Ed 2d 410 (1986).
Nor has this Court held that the protective rules enumerated by People v Anderson[1] and its progeny apply to on-the-scene identification procedures and require counsel during those procedures. People v *612 Anderson, 389 Mich 155, 186 n 23; 205 NW2d 461 (1973). In fact, the opposite is true. Id.
Yet the majority undertakes today ostensibly to resolve these issues. Its purpose is to take away the potential defendant’s entitlement to counsel during all preindictment[2] proceedings by overruling Anderson and its progeny. Hereafter, a defendant, in custody but not yet indicted, will no longer have the practical ability to challenge photographic or corporeal identification procedures. The police will be able to conduct such procedures without allowing a defendant’s attorney to be present. Moreover, even after the initiation of adversarial judicial procedures, a criminal defendant will no longer have the right to counsel during a photographic showup.
Because I do not see any good reason to depart from longstanding precedent, I must respectfully dissent.
The majority is not correct in its assertion that, under Anderson, “the right to counsel was extended to all pretrial corporeal identifications, including those occurring before the initiation of adversarial proceedings.” Ante at 605. Anderson, which itself dealt with the right to counsel for pretrial custodial photographic showup procedures, set forth “justified” exceptions, albeit arguably in dicta, for the absence of counsel at eyewitness identification procedures. Notably included as exceptions were emergency situations requiring immediate identification and “prompt, ‘on-the-scene’ corporeal identifications within minutes of the crime . . ..” Id., at 187 n 23 (citations omitted). We have since specifically affirmed the Anderson exception for *613 prompt on-the-scene identifications. City of Troy v Ohlinger, 438 Mich 477, 487; 475 NW2d 54 (1991).
The majority could reaffirm the Anderson exception for prompt on-the-scene identifications, or perhaps enlarge the explanation of the exception to provide a workable framework for the lower courts. Instead, it unnecessarily chooses to remove the Anderson protections from all preindictment identification procedures. It is an ill-conceived decision that ignores principles of stare decisis. It also fails to consider the adverse effect on defendants’ rights to be assured that pretrial identifications are not obtained through mistake or unnecessarily suggestive procedures.
In deciding to remove the Anderson protections for all preindictment identifications, the majority chooses to decide an issue already decided. It sweeps aside longstanding precedent, asserting that the Anderson protections reflect the policy preferences of the Anderson Court and that the Jackson Court failed to justify the Anderson Court’s ruling.[3] Apparently the majority’s own “policy preferences” outweigh those of the members of the Anderson Court and the Jackson Court, as well as other members of this Court. Unlike the majority, I believe Anderson was decided with due deference *614 to the practical problems of ensuring accurate identifications. I am concerned that the majority’s policy decision gives insufficient thought to the underlying rationale for our long-existing decision to grant counsel to defendants where practicable.
Anderson discussed at length the scope of the problem of misidentifications, particularly in the use of photographic identification procedures. Anderson, supra at 182-187, 192-220 Appendix A. These concerns have certainly not diminished with time. See, e.g., Utah v Ramirez, 817 P2d 774, 779-780 (Utah, 1991); Rutledge, They all look alike: The inaccuracy of cross-racial identifications, 28 Am J Crim L 207, 209-210 (2001); Brigham, Disputed eyewitness identification evidence: important legal and scientific issues, 36 Ct Rev 12, 12-13 (1999). Wise, A survey of judges’ knowledge and beliefs about eyewitness testimony, 40 Ct Rev 6, 6-8 (2003); Risinger, Three card monte, Monty Hall, modus operandi and “offender profiling”: Some lessons of modem cognitive science for the law of evidence, 24 Cardozo L Rev 193, 194 (2002). The latter law review article noted that the past century has seen the accumulation of literally thousands of studies on the weakness of eyewitness testimony. Id.
Defendant points out in his appellate brief that in 1996, after DNA identification techniques became more common, the United States Justice Department conducted a study of exonerated defendants and prepared a research report. Connors, Convicted by juries, exonerated by science: Case studies in the use of DNA evidence to establish innocence after trial (1996). The study was commissioned by the National Institute of Justice. It reviewed twenty-eight cases where the defendants had been exonerated through the use of DNA identification techniques.
*615 Among the conclusions reached was that, in the majority of cases, “eyewitness testimony was the most compelling evidence. Clearly, however, those eyewitness identifications were wrong.” Id. at 24. Notably, one of the significant factors of misidentification listed in the Justice Department report involves an issue directly raised in the instant case and the majority’s decision to overrule Anderson: the potential susceptibility of eyewitnesses to suggestions from the police, whether intentional or unintentional. Id.
One of the major underpinnings of the Anderson decision, and the later affirmation in Jackson,[4] was the recognition of difficulties with obtaining reliable identification evidence. Courts and scholars have recognized the continued validity of these concerns. Nonetheless, this Court refuses to recognize that Anderson’s rules were, in fact, grounded on more than a transient notion of what the Sixth Amendment requires.
The majority does so with barely a nod to the principle of stare decisis. As my frequent colleague in the dissent so well articulated recently, “[t]he doctrine of stare decisis is more than a fad and decades of precedent cannot be readily discounted as the majority suggests.” Monat v State Farm Ins Co, 469 Mich 679, 699; 677 NW2d 843 (2004) (CAVANAGH, J., dissenting). “The application of stare decisis is generally the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.” People v Petit, 466 Mich 624, 633; 648 NW2d 193 (2002) (citations and internal quotation marks omitted).
*616 Even if this Court has found that an error occurred, before it “ ‘overrules a decision deliberately made, it should be convinced not merely that the case was wrongly decided, but also that less injury will result from overruling than from following it.’ ” Id. at 634, quoting McEvoy v Sault Ste Marie, 136 Mich 172, 178; 98 NW 1006 (1904). I take as my guide the following from the recent United Supreme Court opinion in Dickerson v United States, 530 US 428, 443-444; 120 S Ct 2326; 147 L Ed 2d 405 (2000), discussing the requirement of Miranda[5] warnings during interrogations:
Whether or not we would agree with Miranda’s reasoning and its resulting rule, were we addressing the issue in the first instance, the principles of stare decisis weigh heavily against overruling it now. See, e.g., Rhode Island v. Innis, 446 U.S. 291, 304, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980) (Burger, C.J., concurring in judgment) (“The meaning of Miranda has become reasonably clear and law enforcement practices have adjusted to its strictures; I would neither overrule Miranda, disparage it, nor extend it at this late date”). While “ ‘stare decisis is not an inexorable command,’ ” State Oil Co. v. Khan, 522 U.S. 3, 20, 139 L. Ed. 2d 199, 118 S. Ct. 275 (1997) (quoting Payne v Tennessee, 501 U.S. 808, 828, 115 L. Ed. 2d 720, 111 S. Ct. 2597 (1991)), particularly when we are interpreting the Constitution, Agostini v. Felton, 521 U.S. 203, 235, 138 L. Ed. 2d 391, 117 S. Ct. 1997 (1997), “even in constitutional cases, the doctrine carries such persuasive force that we have always required a departure from precedent to be supported by some ‘special justification.’ ” United States v. International Business Machines Corp., 517 U.S. 843, 856, 116 S. Ct. 1793, 135 L. Ed. 2d 124 (1996) (quoting Payne, supra, at 842 (SOUTER, J., concurring) (in turn quoting Arizona v. Rumsey, 467 U.S. 203, 212, 81 L. Ed. 2d 164, 104 S. Ct. 2305 (1984))).
*617 We do not think there is such justification for overruling Miranda. Miranda has become embedded in routine police practice to the point where the warnings have become part of our national culture. See Mitchell v. United States, 526 U.S. 314, 331-332, 143 L. Ed. 2d 424, 119 S. Ct. 1307 (1999) (SCALIA, J., dissenting) (stating that the fact that a rule has found “ ‘wide acceptance in the legal culture’ ” is “adequate reason not to overrule” it). While we have overruled our precedents when subsequent cases have undermined their doctrinal underpinnings, see, e.g., Patterson v. McLean Credit Union, 491 U.S. 164, 173, 105 L. Ed. 2d 132, 109 S. Ct. 2363 (1989), we do not believe that this has happened to the Miranda decision. If anything, our subsequent cases have reduced the impact of the Miranda rule on legitimate law enforcement while reaffirming the decision’s core ruling that unwarned statements may not be used as evidence in the prosecution’s case in chief.
In the instant case, the injury done by unnecessarily overruling Anderson is grave. Conversely, the continued use of its precedent would harm no one but those who fail in their duty to ensure that identifications are made under circumstances that render them reliable. The use of counsel during preindictment procedures has become part of the accepted practice in Michigan courts. I see nothing even approaching a “special justification” to depart from precedent here.[6]
The majority incorrectly asserts that defendant’s due process protections will be sufficient to protect the *618 accused against the introduction of unreliable identification evidence. Ante at 607. Such an assertion ignores the reality of numerous preindictment identification procedures and this Court’s attempt to ensure that these procedures lead to reliable information.
The fact that the majority has seen fit to unnecessarily overturn Anderson creates a Catch-22 for defendants during other preindictment identification procedures. Until today, a defendant who was not “formally” charged but in custody was entitled to an attorney during any identification procedure. Now, the only required persons in the room will be the investigating officer and the witness. Where the defendant is presented to a potential witness during an on-the-scene identification, the defendant himself is present to observe the actions and words of the officer. Arguably, a defendant who has been subjected to an unnecessarily suggestive on-the-scene identification procedure has the opportunity to present a coherent rationale for his arguments.
In contrast, a defendant who seeks to challenge a corporeal identification procedure will be effectively unable to do so. He must stand before the one-way glass and trust the competence and conscience of the investigating officer. I doubt that J.R.R. Tolkien’s image of Wormtongue whispering quietly into the ear of Theoden, King of Rohan[7] will be one that is frequently repeated in practice. However, even an inadvertent suggestion will be imperceptible to a defendant who remains precluded from witnessing it.[8] The majority is essentially creating a black box into which the defen *619 dant will not be allowed to peer. It then requires him to refute the premise that what occurred inside did not violate his right to due process.
Nothing in the majority’s opinion provides for substitute protections to guard against overzealous individual officers or the failure of an officer to avoid or correct potentially suggestive procedures in these cases. As one author has aptly noted, the fact that identification evidence is unique in character should instead warrant the imposition of greater protections, rather than less:
In most situations the state simply collects preexisting evidence about a crime; through pretrial identifications the state creates a piece of evidence that would not otherwise exist. The creation of evidence, rather than its collection, should impose a special obligation on the state to behave correctly, because the creation of evidence presents heightened opportunity for wrongdoing and unfairness by the state and to the detriment of the defendant. [Rosenberg, Rethinking the right to due process in connection with pretrial identification procedures: An analysis and a proposal, 79 Ky L J 259, 291-292 (1991) (emphasis omitted).]
I disagree with the majority’s decision to effectively remove any ability for a criminal defendant to raise a due process argument relating to these preindictment identification procedures. In so doing, I agree wholeheartedly with Justice Brennan’s dissenting statement in Kirby v Illinois, 406 US 682, 699 n 8; 92 S Ct 1877; 32 L Ed 2d 441 (1972):
As the California Supreme Court pointed out, with an eye toward the real world, “the establishment of the date of formal accusation as the time wherein the right to counsel at lineup attaches could only lead to a situation wherein *620 substantially all lineups would be conducted prior to indictment or information.” People v. Fowler, 1 Cal. 3d 335, 344, 461 E 2d 643, 650 (1969).
Until today, Michigan has not known this to occur. However, I seriously doubt that it will long be the case after the majority’s ruling.
In addition, the majority claims that it is not deciding today whether a defendant retains the protection of counsel at custodial photographic showups, ante at 609 n 4. However, it is clear from the thrust of the majority opinion that such protections have been removed. Anderson itself involved a photographic lineup where the defendant was in custody before the photographs were shown to the witness. Anderson, supra at 160. Because of the Court’s distrust of photographic identification procedures, it established rules regarding their use, including the right to counsel when a suspect is in custody. See People v Kurylczyk, 443 Mich 289, 298; 505 NW2d 528 (1993), citing Anderson, supra at 186-187.
The United States Supreme Court stated in United States v Ash,[9] that the Sixth Amendment does not guarantee the right to counsel at photographic displays where witnesses attempt to identify a suspect. This is true, even when the suspect is in custody. Anderson, supra at 186-187. However, as noted by the majority, ante at 605-606, Jackson took Ash into consideration and nevertheless affirmed the Anderson decision to extend the protections to suspects in Michigan. It did so using the power of the Court to exercise its authority to establish rules of evidence. Jackson, supra at 338.
Today, the majority decides to overrule Anderson and repudiate the Jackson rationale. Ante at 606. Therefore, it has removed the protection of counsel at custodial *621 photographic showups. I leave for another day an enumeration of the additional areas of law affected by the majority’s sweeping language and abdication of judicial power.
I realize that it might be difficult at times for the majority to keep track of the specific cases it is overruling. This is due in part to its propensity to reach for issues and decide them with a broad pen stroke. However, when one specifically mentions a case by name, it should be easy to remember that its holding must be analyzed before it is rejected.
Finally, I disagree with the majority’s disposition of the question whether the identification procedure used here violated defendant’s right to due process irrespective of whether a Sixth Amendment right to counsel existed. Especially because defendant was sixteen at the time of his arrest, I find troubling the majority’s abdication of the issue to the Court of Appeals without any further explanation.
In conclusion, I believe that the majority has reached out to take this case needlessly in order to address constitutional questions. I would further find that, whatever the scope of the protections of the Sixth Amendment or Michigan’s Constitution, the decision to overrule Anderson is misguided. It has been made without due deference to the principles of stare decisis and without a comprehension of the practical realities of frequent eyewitness misidentifications.
CAVANAGH, J., concurred with KELLY, J.

 389 Mich 155, 186 n 23; 205 NW2d 461 (1973).

 For ease of explanation, I use the term “preindictment identifications” to refer to identifications that occur before the initiation of adversarial judicial proceedings.

 The majority relies on McDougall v Schanz, 461 Mich 15, 29; 597 NW2d 148 (1999), for the proposition that this Court “disapproved of previous blanket statements of authority over all matters relating to the admission of evidence.” I did not then, nor do I now,, agree with the majority opinion in McDougall. But it is my understanding that McDougall was not a broad disapproval of blanket statements regarding the admission of evidence. Rather, it was a disapproval of a specific rule of evidence. Even the McDougall majority acknowledged that the fine between substantive law and practice and procedure must be drawn case by case. McDougall, supra at 36. The McDougall decision concerned the interaction of statutes and this Court’s constitutional rule-making authority over “practice and procedure.” Because there is no statute at issue in this case, McDougall is not applicable.

 Jackson, supra at 338-339.

 Miranda v Arizona, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

 The majority states that this Court has never held that a “special justification” must be established before it will depart from precedent. Ante at 610 n 6.1 disagree. See Brown v Manistee Co Rd Comm, 452 Mich 354, 365; 550 NW2d 215 (1996) (absent the rarest of circumstances, this Court should remain faithful to established precedent). It certainly could be said that the current majority does not share my view and that of Brown. See Delaney, Stare decisis v The “New Majority”: The Michigan Supreme Court’s practice of overruling precedent, 1998-2002, 66 Alb L Rev 871, 903-904 (2003). But I persist in clinging to this archaic notion despite the urging of my colleagues.

 See J.R.R. Tolkien, The Lord of the Rings (New York: Ballantine Books, 1954-1974).

 See United States v Wade, 388 US 218, 228-230; 87 S Ct 1926; 18 L Ed 2d 1149 (1967) (recognizing that the “vagaries” of eyewitness testi *619 mony during a corporeal lineup can be effectively challenged only if there is adequate observation of the process of identification).

 413 US 300, 318; 93 S Ct 2568; 37 L Ed 2d 619 (1973).