# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 12, 2016 Session

## STATE OF TENNESSEE v. THOMAS A. ISBELL

### Appeal from the Circuit Court for Maury County
### No. 22225      Stella L. Hargrove, Judge

_____

### No. M2015-00587-CCA-R3-CD – Filed March 4, 2016

_____

Defendant, Thomas A. Isbell, was convicted of aggravated child abuse after his infant son was brought to Maury Regional Hospital with a spiral fracture of the left humerus. As a result of the conviction, Defendant was sentenced to fifteen years in incarceration as a Range I, standard offender and ordered to serve 100% of the sentence pursuant to Tennessee Code Annotated section 40-35-501(i)(1) and (2)(K). He appeals both his conviction and sentence. After a review of the record and applicable authorities, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS, J., joined. THOMAS T. WOODALL, P.J., filed a concurring opinion.

Claudia Jack, District Public Defender; Michelle VanDeRee (at trial and on appeal), Assistant Public Defender; and Brandon E. White (on appeal), Columbia, Tennessee, for the appellant, Thomas Andrew Isbell.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel, Brent Cooper, District Attorney General; and Dan Runde, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This is the direct appeal from Defendant's conviction for one count of aggravated child abuse for injuries sustained by his twenty-seven-day-old infant son.

Desiree Hall Isbell, the wife of Defendant,[1] described January 7, 2013, as a typical day. She got up around 3:00 a.m. to iron Defendant's uniform and made sure he woke up in time to get ready for work and to drive from Columbia to his job in Nashville at Riverbend Maximum Security Prison. Mrs. Isbell was not working at the time as the couple had a twenty-seven-day-old son, M.I.[2] Defendant asked Mrs. Isbell to sweep the kitchen of the apartment and wash the dishes while he was at work. Defendant left for work at 4:10 a.m. Mrs. Isbell described M.I.'s behavior as fussy that day—the infant had his days and nights "mixed up" and had a cold. Mrs. Isbell claimed that the infant could roll from his back to his side.

At some point that day, Mrs. Isbell swept the floor. In anticipation of Defendant's arrival home from work, Mrs. Isbell prepared chicken alfredo for dinner. Defendant came home around 7:30 p.m. Mrs. Isbell was in the living room with M.I. Defendant was upset that Mrs. Isbell had not washed the dishes. Rather than argue with Defendant, Mrs. Isbell walked away. She decided to clean the bathroom so that she could be by herself for a few minutes. When she left the room, Defendant was lying on the couch and M.I. was lying on Defendant's chest.

Mrs. Isbell heard the baby get a little fussy in the other room. She could hear Defendant walk across the floor to get a bottle. Defendant came into the bathroom several times to tell her that she did not have to clean the bathroom. Defendant told her that it was late and that the noise could possibly disturb the neighbors. Defendant went back to the living room.

A few minutes later, Defendant came to the door of the bathroom and explained that M.I. fell off the couch and his arm did not look right. The baby was crying in Defendant's arms and his left arm was dangling beside him. Defendant told Mrs. Isbell that they needed to take the child to the hospital.

When they arrived at the hospital, they waited for about five hours prior to being seen by Dr. Michael Richardson in the emergency room at Maury Regional Medical Center. After an x-ray, it was discovered that M.I. suffered a spiral fracture of the left arm. Hospital staff was told that the child fell off the couch—Dr. Richardson explained that it was not possible for the child to receive such a fracture if the infant was found "on the floor, facedown, back up, with the left arm underneath." Additionally, if the infant fell off the couch, there would have also been some type of head injury because the head is larger than the rest of the body and there is not enough muscle tone to control the neck

---

[1] The couple was not married at the time of the incident that gave rise to the criminal charges herein. They did later marry on July 27, 2013.

[2] It is the policy of this Court to refer to minor victims of abuse by their initials in order to protect their identity.

and head.  The parents told nurse Danny Winget that the infant had rolled off the couch. There was also mention of the cat causing the infant to fall off the couch while Defendant was in the kitchen making the bottle.

Dr. William Brewer, a board certified radiologist, estimated that during his twelve years as a radiologist he had viewed approximately 250,000 x-rays and could recall "three or four - - three maybe" of the type of fracture seen in this case.  M.I. suffered an "acute spiral type fracture of the mid diathesis of the left humerus," a "relatively rare, relatively unusual" fracture for a twenty-seven-day-old infant.  Dr. Brewer explained that children's bones are "more flexible" than adult bones.  He opined that fractures in infants less than thirty days old are "unusual to very unusual."  Spiral fractures "typically" occur "when you have a fixed end of a long bone and a rotational force is applied to the other end of a long bone."  In other words, the bone is "twisted, usually at one end."  Dr. Brewer did not believe that the injuries sustained by the victim in this case could have been caused by a fall from the couch on to carpeted flooring or by picking the child up from the floor.  However, Dr. Brewer testified that spiral fractures can be caused accidentally but that it would take "substantial torsional force" to cause this type of fracture.  Dr. Brewer admitted that the fracture could occur from acting out of "panic," picking up a child and spinning it if one arm is fixed and the body is moving.

Following regular protocol, the hospital notified the Department of Children's Services ("DCS") and the authorities.  Charlotte Walker, a DCS employee and Child Protective Services Investigator, met with M.I.'s parents at the hospital.  Defendant told her that he and the infant were in the living room.  Defendant explained that he laid the child on the edge of the couch and went to the kitchen to fix a bottle.  When he returned, the child had rolled off the couch.

Detective Mark Craig interviewed Defendant.  Defendant waived his rights and submitted a written statement:

On January 7, '13, approximately 6:15 p.m., I left work.  I got home. I [saw] a sink full of dishes.  I didn't say anything at first.  I [saw] dinner was cooked, stated, "I wasn't hungry."

I sat in the living room about 9:00ish watching T.V. and playing on the P.C.  Desi handed me [M.I.] and I was rocking him and still messing with the P.C.  It was roughly 9:30 when I saw Desi—I said, "Desi, you sent me a text promising me the house would be spotless, clean today."

I was upset about it.  Desi stormed off and started cleaning the bathroom up.  I said, "It's late, let's get some sleep."

I was left to tend to [M.I.]. He was crying, kicking, and hitting in the air. So I went to make him a new bottle[.]

When I got back, he was lying on the floor off the couch. I picked him up quickly, maybe too rough. When I picked him up, I spun, like, tossed him around.

After I had him, I noticed his arm was limp and dangling like.

I called Desi into the room and said, "I think I hurt him, so we need to take him to the doctors.

Desi is now crying, saying, "I hope they don't take him away,"

I said, "No one on purpose hurt him. It will be okay."

We got to the E.R., waited forever there. Got there about 22:30, wasn't seen until 3:30-ish.

The doctor looks at [M.I.'s] arm; stated that his arm was broke before x-rays confirmed it was broken.

M.I. was transported to Vanderbilt for a full skeletal survey. Pediatric Nurse Practitioner Carrie Donnell evaluated the infant on January 9, 2013, at Vanderbilt. The skeletal survey revealed the broken humerus bone but no other skeletal injuries. Ms. Donnell opined that the spiral fracture would have been caused by a twisting motion. She admitted, however, that there are case reports of spiral fractures occurring as a result of an accident. For example, if a child is accidentally dropped and the caregiver tries to grab the child's arm to catch the child from falling, a spiral fracture could occur. Ms. Donnell noted that Defendant acknowledged that he believed he injured M.I. Ms. Donnell also mentioned that an infant the age of M.I. would not "yet [be] rolling over, pulling[] up, running around, playing." A follow-up skeletal survey, performed two weeks later, showed healing of the spiral fracture and no other injuries.

After being advised of his *Moman* rights, Defendant did not testify or present any proof.

Based upon this evidence, they jury found Defendant guilty as charged. The trial court held a sentencing hearing and sentenced Defendant to fifteen years as a Range I, standard offender. Defendant appealed.

*Analysis*

On appeal, Defendant first challenges the sufficiency of the evidence. In particular, he insists that the State "failed to present sufficient evidence at trial to prove beyond a reasonable doubt that [Defendant] knowingly inflicted serious bodily injury to his child." Defendant acknowledges that M.I. suffered serious bodily injury but claims that the State failed to prove mens rea and that the injury was not the result of an accident. The State, on the other hand, argues that the jury reviewed the evidence and properly found Defendant guilty of aggravated child abuse.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Reid*, 91 S.W.3d at 277. Questions concerning the "credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Defendant was indicted for violating Tennessee Code Annotated section 39-15-402, also known as Haley's Law, which defines aggravated child abuse. As charged in this case, it is an offense to knowingly, other than by accidental means, treat a child in such a manner as to inflict injury, *see* T.C.A. § 39-15-401(a), and the victim suffered serious bodily injury, T.C.A. § 39-15-402(a)(1). If the child is eight years of age or less, the offense is punishable as a Class A felony. T.C.A. § 39-15-402(b).

Defendant does not contest that the victim suffered serious bodily injury. He contends only that there was not sufficient proof that the injury was committed

knowingly. Viewing the evidence in the light most favorable to the State, the proof establishes that M.I. suffered a spiral fracture of the humerus. There was a multitude of medical testimony at trial. According to Dr. Richardson, this injury could not have occurred in any of the ways that Defendant described. Dr. Richardson testified that a twenty-seven-day-old infant could not roll over by itself and, if the baby fell off the couch as described, there would be some type of head injury. Additionally, Dr. Richardson testified that someone found the infant on the floor in a face down position with the left arm under the body, it would not cause a spiral fracture. Likewise, Dr. Brewer testified that a fall from a couch onto carpeted flooring would not produce the type of fracture that M.I. received. Dr. Brewer also opined that picking a child up from the floor would likely not cause a spiral fracture. Ms. Donnell agreed that a spiral fracture could not be caused by a fall from a couch and that a twenty-seven-day-old infant did not have the strength or ability to cause the fractures itself. Ms. Donnell admitted that there were several cases of which she was aware where spiral fractures were deemed to be caused by accident but testified that it was most likely that M.I.'s arm was twisted. Defendant admitted in his statements to police and medical personnel that he caused M.I.'s injury but maintained it to be an accident.

In a case of this nature, it is left to the sound judgment of the trier of fact to reconcile what occurred, beyond a reasonable doubt. We as a global society have made great strides with marvelous inventions and are now able to accomplish things that once were unimaginable. However, to date, our modern advancements have failed to design a device that will deliver reliable results to questions of what was going on inside the mind of a human that would cause such tragedies. For better or worse, no system is more reliable than the litigation process. No computer program, scientific instrument, or any other device can be employed to determine the mental state of any defendant or indicate if he or she is telling the truth. In our system, that grand and solemn result rests with our fellow man. In this case, a jury of one's peers.

Even though Defendant claimed it was an accident, the jury heard the evidence and assessed the credibility of the witnesses and weighed the proof. The jury, by its verdict, discredited Defendant's theory. The evidence was sufficient to support the conviction.

*Sentencing*

Next, Defendant insists that the trial court committed "plain error" by violating his Fifth Amendment privilege of self-incrimination and by classifying him as a standard offender. Specifically, Defendant argues that the trial court explicitly noted Defendant's failure to allocute at the sentencing hearing and held it against him—thereby breaching a clear and unequivocal rule of law and substantially affecting the rights of Defendant. Defendant also argues that the trial court "abused its discretion" when classifying him as

a standard offender rather than an especially mitigated offender. The State argues that the trial court did not abuse its discretion in sentencing Defendant and did not violate his Fifth Amendment rights. Moreover, the State notes that Defendant failed to object to the trial court's statements during the sentencing hearing and failed to raise any issue with respect to his Fifth Amendment rights in the motion for new trial. For these reasons, the State insists that the trial court properly sentenced Defendant to a fifteen-year sentence.

When an accused challenges the length, manner, or range of a sentence, this Court will review the trial court's decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013); *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. T.C.A. § 40-35-401, Sent'g Comm'n Cmts.; *see also State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

At the conclusion of the sentencing hearing, the trial court noted that Defendant did not have a prior record. Additionally, the trial court noted that Defendant had received treatment for bipolar disorder, a diagnosis received after the conviction was received herein. The trial court also noted Defendant's continuous employment and military service, both of which were terminated upon his conviction. The trial court stated the following with regard to the facts and circumstances surrounding the offense and the nature of the criminal conduct involved:

> [I]t is this Court's position that we never got to the truth of what happened. We never got to the truth in this courtroom of what happened to baby [M.I.].
>
> I know that there are some people here that truly believe that this was an accident. . . . .And of the medical people that we hear[d] from, . . . , what we heard over and over again was this is a rare injury in a twenty-seven-day-old baby.
>
> . . . .
>
> We don't know what happened, but we know two people who know what happened and that would be [Defendant] and the mother. The rest of us don't know. This jury didn't know.

. . . .

And so we don't know what happened, but [Defendant] does. I was hoping I might learn today, but I will not learn.

The trial court considered but did not apply any enhancement factors. The trial court did discuss and apply mitigating factors. The trial court considered the fact that Defendant did not have a prior record, was gainfully employed at the time of the offense, and had a military record. However, the trial court noted that it wanted to provide an effective deterrent to discourage child abuse and noted that Defendant had a "complete failure to accept any responsibility in harming a child where the injury can only be caused by a twisting force." The trial court sentenced Defendant to the minimum sentence of fifteen years, to be served at 100%.

Defendant argues first that the trial court should have classified him as an especially mitigated offender. Tennessee Code Annotated section 40-35-109 provides that a trial court "*may* find the defendant is an especially mitigated offender, if: (1) the defendant has no prior felony convictions; and (2) the court finds mitigating, but no enhancement factors." This provision is discretionary. *State v. Braden*, 867 S.W.2d 750, 762 (Tenn. Crim. App. 1993). While Defendant was eligible to be sentenced as an especially mitigated offender, the trial court was not obligated to make such a finding. The trial court followed the proper sentencing procedure, classified Defendant as a Range I, standard offender, and sentenced him to the minimum sentence in that range. The trial court did not abuse its discretion. Defendant is not entitled to relief.

Next, Defendant argues that the trial court committed plain error by considering his failure to allocute during sentencing. Defendant failed to object during sentencing, presenting it for the first time on appeal, thus Defendant has waived this issue. *See State v. Turner*, 919 S.W.2d 346, 356-57 (Tenn. Crim. App. 1995) ("A party may not raise an issue for the first time in the appellate court."). Defendant acknowledges his failure and urges this Court to review the issue via plain error.

Tennessee Rule of Appellate Procedure 36(b) provides that, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." We will not grant relief on the basis of plain error unless the following five requirements are satisfied:

(a) the record clearly establishes what occurred in the trial court;
(b) a clear and unequivocal rule of law was breached;
(c) a substantial right of the accused was adversely affected;
(d) the accused did not waive the right for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283. The burden is on the defendant to persuade the appellate court that the trial court committed plain error and that the error was of "such a great magnitude that it probably changed the outcome of the trial." *Id.* (quoting *Adkisson*, 899 S.W.2d at 642); *see also* Tenn. R. App. P. 36(b) (relief may be granted when an "error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process"). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006).

Tennessee Code Annotated section 40-35-210(b)(7) provides that, in determining a defendant's sentence, the trial court shall consider any statement the defendant wants to make in his own behalf about sentencing. Often referred to as allocution, it is "an unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending sentence. This statement is not subject to cross-examination." Black's Law Dictionary 75 (7th ed. 1999); *see also United States v. Gilbert*, 244 F.3d 888, 924 (11th Cir. 2001).

Defendant insists that the trial court breached a clear and unequivocal rule of law by drawing an "adverse inference against the defendant based on his silence about a fact or circumstance at issue." He cites *White v. Woodall*, ___ U.S. ___, 134 S. Ct. 1697, 1703 (2014), to support his argument. In *White*, the Court stated:

> We have, it is true, held that the privilege against self-incrimination applies to the penalty phase. *See Estelle*[ *v. Smith*, 451 U.S. 454,] 463, 101 S.Ct. 1866; *Mitchell*[ *v. U.S.*, 526 U.S. 314,] 328-329, 119 S.Ct. 1307. But it is not uncommon for a constitutional rule to apply somewhat differently at the penalty phase than it does at the guilt phase. *See, e.g.*, *Bobby v. Mitts*, 563 U.S. ___, ___, 131 S.Ct. 1762, 1764-1765, 179 L.Ed.2d 819 (2011) (per curiam). . . .
>
> Indeed, *Mitchell* itself leaves open the possibility that some inferences might permissibly be drawn from a defendant's penalty-phase silence. In that case, the District Judge had actually drawn from the defendant's silence an adverse inference about the drug quantity attributable to the defendant. *See* 526 U.S. at 317-319, 119 S.Ct. 1307. We held that this ran afoul of the defendant's "right to remain silent at

sentencing." *Id.* at 325, 327-328, 119 S.Ct. 1307 (citing *Griffin v. California*, 380 U.S. 609, 614, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965)). But we framed our holding narrowly, in terms implying that it was limited to inferences pertaining to the facts of the crime: "We decline to adopt an exception for the sentencing phase of a criminal case *with regard to factual determinations respecting the circumstances and details of the crime*." *Mitchell*, 526 U.S. at 328, 119 S.Ct. 1307 (emphasis added). "The Government retains," we said, "*the burden of proving facts relevant to the crime* . . . and cannot enlist the defendant in this process at the expense of the self-incrimination privilege." *Id.* at 330, 119 S.Ct. 1307 (emphasis added). And *Mitchell* included an express reservation of direct relevance here: "Whether silence bears upon the determination of a lack of remorse, or upon acceptance of responsibility for purposes of the downward adjustment provided in § 3E1.1 of the United States Sentencing Guidelines (1998), is a separate question. It is not before us, and we express no view on it." *Ibid.*

134 S. Ct. at 1703. The trial court in this case commented on Defendant's failure to accept responsibility for the infant's injury, not on Defendant's failure to allocute. The trial court did not violate the holding of *Mitchell* by drawing an adverse inference about the facts of the crime from Defendant's silence at the sentencing hearing. In our view, Defendant has failed to show both that a clear and unequivocal rule of law has been breached and consideration of this error is necessary to do substantial justice. He has not established all five factors necessary for our review. The trial court's actions did not constitute plain error. Defendant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE