FILED

03/31/2017

Clerk of the
Appellate Courts



# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### December 13, 2016 Session

## STATE OF TENNESSEE v. NICOLE IRIZZARY

**Appeal from the Circuit Court for Stewart County**
**No. 2013-CR-10     Larry J. Wallace, Judge**

_____

## No. M2016-00465-CCA-R3-CD

_____

The defendant, Nicole Irizzary, pled *nolo contendere* to voluntary manslaughter as a lesser-included offense of second degree murder (Count 1), possession of a Schedule II Drug (Count 2), and child abuse and neglect as a lesser-included offense of aggravated child abuse (Count 3). The trial court sentenced the defendant to concurrent, four-year sentences for Counts 1 and 2, to run consecutively to a four-year sentence for Count 3. The trial court denied the defendant's request for alternative sentencing and ordered the effective eight-year sentence to be served in confinement. On appeal, the defendant argues the trial court abused its discretion by denying her request for alternative sentencing and committed plain error by improperly relying on the defendant's silence at the sentencing hearing. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court affirmed.**

J. ROSS DYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Jerred A. Creasy, Dickson, Tennessee, for the appellant, Nicole Leigh Irizzary.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Ray Crouch, District Attorney General; Margaret Sagi, and Sarah Wojnarowski, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

On October 14, 2012, the defendant's sixteen-year-old daughter died from a fatal combination of alcohol and the narcotic oxymorphone. Following the victim's death, the

defendant was charged with: second degree murder (Count 1); possession of a Schedule II Drug (Count 2); aggravated child abuse (Count 3); contributing to the delinquency of a minor (Counts 4 and 5); conspiracy to sell a Schedule II drug (Count 6); and criminally negligent homicide (Count 7). The defendant pled *nolo contendere* to voluntary manslaughter under Count 1, possession of a Schedule II Drug under Count 2, and child abuse under Count 3.[1] Per the terms of the plea agreement, the remaining counts were dismissed. The trial court sentenced the defendant to four years under Count 1, concurrent with, four years under Count 2, and both consecutive to four years under Count 3, for an effective sentence of eight years. On January 5, 2016, the trial court held a sentencing hearing in order to determine whether the defendant would serve her sentence in confinement or through an alternative sentence.

At the sentencing hearing, Special Agent Shawn Adkins of the Tennessee Bureau of Investigation testified that he was charged with investigating the victim's death. On October 14, 2012, Agent Adkins went to the home where the victim died. James Skelton,[2] the owner of the home, consented to a search of the premises. Inside, Agent Adkins found the victim's body in the bed of Dayzon, the victim's boyfriend. The victim was "on her back and her hands were up near her shoulders" with a pool of blood near her body. There were no signs of trauma or wounds to the victim's body. Crime scene officers found a yellow pill in the pocket of the victim's jeans which were located at the foot of the bed. Technicians with the Tennessee Bureau of Investigations tested the yellow pill and identified it as Opana, a potent form of oxymorphone.

Upon further investigation, Agent Adkins learned that the victim, Dayzon, Darius, and Evelyn Dollar went to a party in Dover, Tennessee the evening of October 13, 2012. Agent Adkins and another investigator interviewed approximately twenty individuals who were at the same party. Witnesses indicated alcohol was consumed at the party even though there were minors present. A number of witnesses recalled Dayzon, Darius, the victim, and Evelyn Dollar being present at the party, and the victim attempting to sell pills.

When Agent Adkins asked the defendant about the yellow pill found in the victim's pocket, the defendant denied any knowledge of the same. However, the defendant admitted she was prescribed Opana for back pain. Agent Adkins also learned the defendant filled an Opana prescription for sixty pills on October 4, 2012. According

---

[1]The trial court made a clerical error on the judgment forms regarding Counts 2 and 3. In the original indictment, the defendant was charged with possession of a schedule II drug under Count 2 and aggravated child abuse under Count 3. The judgment forms, however, indicate the child abuse offense under Count 2 and the drug offense under Count 3.

[2]Because several individuals, James Skelton, Dayzon Skelton, and Darius Skelton, have the same last name, we will refer to them by their first name. We intend no disrespect.

to Agent Adkins, the number of deaths attributed to Opana overdose has increased since 2012.

In her initial statement to Agent Adkins, the defendant denied giving the victim pills and specifically stated, "I didn't give [the victim] any pills . . . I have never sold my pills or asked anyone to sell my pills." The defendant stated that on the morning of the victim's death, she received a call from Dayzon. He told her the victim was having trouble breathing and he could not wake her up. The defendant went to the Skelton home and found the victim lying in a bed "blue and stiff."

After taking the defendant's statement, Agent Adkins obtained consent to search the cell phones of the defendant, the victim, and Dayzon. One series of text messages recovered from the victim's phone detailed a conversation from October 12, 2012, between Dayzon and the victim. In the conversation, the two discuss getting pills from the defendant to sell. According to Agent Adkins, the victim wrote, "Hey, my mom said that she was wondering if you could get rid of a few pills for her because her insurance came out and she has none. She told me to ask you." Dayzon replied, "How much money she need?" Agent Adkins stated that the victim responded, "She said maybe 60 to 80 . . . She just didn't know her insurance came out and when she tried to get gas, her card wasn't working because no money. But she has 36 pills left told me to take 10 . . . ."

Agent Adkins testified that in another text exchange the victim wrote, "[the defendant] just found 6 more, lol. Damn, she yes-no, yes-no all morning but told me to get 6 more so we got 16 now. She said we can have 10 or 12. She just really needs some money for gas. And, she said, NOW, KRISTEN, I SHOULDN'T BE TEXTING YOU THIS." Further, on the evening of October 13, 2012, the victim texted the defendant again. According to Agent Adkins, the text exchange read, "Dayzon didn't even bring the pills so can you bring 10 with you and we get them when we give you the 30? So we can hopefully sell them to get gas money for way home." The defendant responded, "Yes."

Agent Adkins also discovered text conversations between the defendant and her boyfriend, Billy Williams, in which the two discussed selling pills to another individual, Kendrick Stacker. Agent Adkins recovered additional messages from the defendant's phone from later in the evening on October 13, 2012, between the defendant and the victim in which they discussed the victim and Dayzon selling pills at the defendant's request. The text messages were entered as an exhibit at the sentencing hearing.

After reviewing all of the text messages, Agent Adkins conducted a second interview with the defendant on November 7, 2012. The defendant admitted to giving Dayzon ten Opana pills earlier in the week of October 13, 2012, but continued to deny

having given the victim or Dayzon any pills the night the victim died. She told Agent Adkins that she gave the Opana pills to the victim and Dayzon for them to sell so they could make some money. The defendant also told Agent Adkins she had given Kendrick Stacker two Opana pills to sell for her.

Agent Adkins also interviewed Dayzon a second time. Dayzon told Agent Adkins that he and the victim met the defendant in Clarksville, TN on October 13, 2012. The victim got out of his car and went to the defendant's car. When the victim returned to his car, she had the Opana pills in her hand.

Agent Adkins testified that the pill found in the victim's pocket matched the Opana prescription recently filled by the defendant. He searched Dayzon's home and discovered a small tin container with eleven Opana pills inside. Dayzon told Agent Adkins he received the Opana pills from the defendant. The investigation revealed the victim and Dayzon sold a minimum of four Opana pills, though the exact number of pills sold was undetermined.

Additionally, Agent Adkins learned of two separate occasions during the week of October 13, 2012, in which the defendant provided Opana pills to the victim. On one occasion the defendant gave the victim ten pills, and on another occasion she provided sixteen pills, for a total of twenty-six pills. In addition to Dayzon's testimony, Darius and Evelyn Dollar also provided statements that they witnessed the defendant give pills to the victim. Finally, Kendrick Stacker told Agent Adkins that the victim received the pills from the defendant to sell in order to get gas money.

On cross-examination, Agent Adkins testified the defendant cooperated with the investigation, consented to a search of her cell phone, and gave statements when requested. Agent Adkins admitted he did not search the defendant's home or verify the number of pills in her possession at the time of the victim's death. However, upon examination by the trial court, Agent Adkins testified that the defendant attempted to conceal and downplay her involvement in the victim's death throughout the investigation.

Dr. Thomas Deering, a Deputy Chief Medical Examiner, also testified at the sentencing hearing. Dr. Deering reviewed the information provided to him by law enforcement surrounding the victim's death, studied the victim's medical history, and also performed an examination of the victim's body. As part of his examination, Dr. Deering took a sample of the victim's blood, the vitreous fluid behind the victim's eyes, and the victim's urine. The victim's blood sample indicated a blood-alcohol level of .154, a small amount of THC, and the presence of Opana at a concentration of eighty-nine nanograms per milliliter at the time of her death. Dr. Deering also tested the fluid taken from behind the victim's eyes for the presence of narcotics and alcohol. The test

- 4 -

indicated a blood-alcohol level of .179 and the presence of Opana at a concentration of eighty-nine nanograms per milliliter.

Dr. Deering explained that Opana is a very strong form of the narcotic oxymorphone and used to treat chronic pain. A typical dose for someone taking Opana for pain is zero to five nanograms. Ninety nanograms would be a lethal dosage, for someone who does not take Opana on a regular basis, especially when combined with alcohol. Opana related deaths typically occur when individuals take too much, they become drowsy, go to sleep, and never wakeup. This happens because the Opana causes the victim's heart rate to slow so much that their body is unable to recover. Alcohol consumption intensifies this effect. Dr. Deering stated that an individual may appear tired but otherwise fine, go to sleep, and pass away while sleeping. He also testified that he has witnessed an increase in Opana related deaths since 2006-2007.

Dr. Deering testified that, even without the presence of alcohol, the level of Opana in the victim's body would be potentially lethal. According to Dr. Deering, the victim would not have died but for the Opana in her system. Dr. Deering concluded that the victim's cause of death was acute combined multiple drug intoxication of oxymorphone and alcohol.

Connie Turner, of the Board of Probation and Parole, also testified. Ms. Turner prepared a presentence investigation report regarding the defendant. As part of her investigation, Ms. Turner interviewed the defendant, reviewed mitigating and enhancement factors, performed a criminal history background check, and reviewed the circumstances of the case. Ms. Turner also received ten to twelve letters from various members of the victim's family. The defendant was provided an opportunity to make a statement to Ms. Turner, but she declined to do so. The defendant did, however, provide Ms. Turner with information regarding her mental and physical health status. The defendant reported no mental illness but informed Ms. Turner that she takes Opana daily for back pain. The defendant's criminal history report indicated no previous convictions. The defendant also informed Ms. Turner that she had worked for Trane for twenty years at a salary of twenty dollars per hour.

Chris Irizzary, the victim's father and the defendant's ex-husband, testified at the sentencing hearing. At the time of the victim's death, Mr. Irizzary was her primary care parent, although he and the defendant shared custody on a fifty-fifty basis. Two weeks prior to the victim's death, Mr. Irizzary and the defendant agreed not to let the victim spend the night at Dayzon's home. On the morning of the victim's death, the defendant would not tell Mr. Irizzary where the victim was or what caused her death. Rather, he learned the facts surrounding his daughter's death from law enforcement.

The victim's stepmother, Teresa Irizzary, testified the victim was a loving daughter, who made good grades in school, and wanted to be a nurse. According to Mrs. Irizzary, the victim craved the defendant's attention and would do anything to get it. The defendant put her boyfriend and her friends before her role as a mother to the victim. Mrs. Irizzary testified that the defendant showed no remorse for her actions and never accepted responsibility for the part she played in the victim's death. Mrs. Irizzary stated she believed the defendant placed the victim in harm's way, and in doing so "she took [the victim] away from all of us."

The victim's aunt, Carmen Zellman, testified that she is Chris Irizzary's twin sister and had known the victim all of her life. According to Mrs. Zellman, the defendant neglected her role and duties as a parent. Mrs. Zellman testified the defendant showed no remorse.

The defendant also presented proof during the sentencing hearing. Holly Jones testified she met the defendant approximately twenty-two years earlier while working at a Trane facility. Ms. Jones did not know the victim but believed the defendant loved her daughter and was very distraught over her death. She testified that she could tell the defendant was remorseful.

Crystal Hewitt testified that she also worked with the defendant and had known her for a total of thirty years. Based on personal observations, Ms. Hewitt believed the defendant and the victim loved each other. Ms. Hewitt testified that the defendant's behavior had not changed after the victim passed away, but the defendant was a strong person. Ms. Hewitt testified she had no knowledge of the defendant's habits as far as frequenting bars and drinking. Ms. Hewitt never witnessed the defendant going out drinking after the victim's death and stated the defendant was a wonderful parent to the victim. Ms. Hewitt was shocked to hear the defendant was attempting to sell drugs and never personally witnessed her trying to do so.

Finally, Dale Hutchison, the defendant's mother and the victim's grandmother, testified. The defendant and the victim lived with her for several years. According to Ms. Hutchison, the defendant was a good mother to the victim. After the victim's death, the defendant became withdrawn and stayed in her room a lot, though she continued to work. Ms. Hutchison testified that the defendant has held the same job for twenty-two years and has never been in trouble. Ms. Hutchison stated that if the defendant was granted an alternative sentence, she believed the defendant would comply with whatever was required of her.

Ms. Hutchison further testified she never witnessed anything that made her think the defendant was using drugs. She did not know the victim was allowed to spend the

night with older men and did not know the defendant was attempting to have the victim sell drugs for her. Ms. Hutchison stated if the victim spent the night at someone's house, it would have been with the defendant's permission.

At the conclusion of the sentencing hearing, the State asked the trial court to order the defendant to serve her sentence in confinement. The defendant asked the trial court to consider mitigating factors and grant her alternative sentencing. The court considered the evidence presented at the plea and sentencing hearings, the pre-sentence investigation report, and the statutory enhancement and mitigating factors. Tenn. Code Ann. §§ 40-35-113, -114. Based upon its review of the evidence, the trial court denied the defendant's request for alternative sentencing and ordered the defendant to serve her eight-year sentence in confinement. This timely appeal followed.

*Analysis*

A. Alternative Sentencing

The defendant argues that the trial court abused its discretion when it denied her request for alternative sentencing. The State contends the trial court appropriately stated its reasons for denying alternative sentencing on the record, and the proof established at the sentencing hearing supports the trial court's decision. The State further argues the sentence imposed was within the appropriate range for each offense, and complied with the purposes and principles of Tennessee's sentencing statute. Upon review, we agree with the State.

The trial court has broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any enhancement and mitigating factors, have been properly addressed." *State v. Bise,* 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.* at 707. In *State v. Caudle,* our Supreme Court clarified that the "abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." 388 S.W.3d 273, 278-79 (Tenn. 2012).

As a result of amendments to the sentencing act in 2005, trial courts are to consider the following factors when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

1) The evidence, if any, received at the trial and the sentencing hearing;
2) The presentence report;
3) The principles of sentencing and arguments as to sentencing alternatives;
4) The nature and characteristics of the criminal conduct involved;
5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b). The trial court must state on the record the factors it considered and the reasons for the ordered sentence. Tenn. Code Ann. § 40-35-210(e); *Bise*, 380 S.W.3d at 706. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

A defendant is not presumed to be a favorable candidate for alternative sentencing. *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-102(6)). The sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D, or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6). No criminal defendant, however, is automatically entitled to probation as a matter of law. *State v. Davis*, 940 S.W.2d 558, 559 (Tenn. 1997). The defendant bears the burden of proving his or her suitability for alternative sentencing options. *Carter*, 254 S.W.3d at 347 (citing Tenn. Code Ann. § 40-35-303(b)). The defendant must show that the alternative sentence imposed "will serve the ends of justice and the best interests of both the public and the defendant." *Hooper v. State*, 297 S.W.2d 78, 81 (Tenn. 1956), *overruled on other grounds*, *State v. Hooper*, 29 S.W.3d 1, 9-10 (Tenn. 2000).

When imposing a sentence of full confinement, the trial court should consider the following:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

    (C)   Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1)(A)-(C). Additionally, the sentence imposed should be "no greater that that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4).

When determining whether to impose incarceration based on deterrence the trial court should consider:

> (1) whether other incidents of the charged offense are increasingly present in the community, jurisdiction, or in the State as a whole,
> (2) whether the defendant's crime was the result of intentional, knowing, or reckless conduct or was otherwise motivated by a desire to profit or gain from the criminal behavior,
> (3) whether the defendant's crime and conviction have received substantial publicity beyond that normally expected in the typical case,
> (4) whether the defendant was a member of a criminal enterprise, or substantially encouraged or assisted others in achieving the criminal objective, and
> (5) whether the defendant has previously engaged in criminal conduct of the same type as the offense in question, irrespective of whether such conduct resulted in previous arrests or convictions.

Tenn. Code Ann. § 40–35–103, Sentencing Comm'n Cmts. Accordingly, this Court will uphold the trial court's imposition of confinement based on the need for deterrence if, based upon the record, a reasonable person "could conclude that (1) a need to deter similar crimes is present in the particular community, jurisdiction, or in the state as a whole, and (2) incarceration of the defendant may rationally serve as a deterrent to others similarly situated and likely to commit similar crimes." *Hooper*, 29 S.W.3d at 9.

In this case, the trial court considered each factor required by Tennessee Code Annotated § 40-35-210 before sentencing the defendant to an effective sentence of eight years in confinement. In addition, before ordering confinement, the trial court reviewed the evidence presented in the presentence report and during the plea hearing and the sentencing hearing. Regarding the nature and characteristics of the criminal conduct involved, the trial court recognized the severity of the loss of the victim on those involved, as well as the severity of the crime. Specifically, the trial court concluded:

The text messages are clear and the circumstantial evidence with it that the defendant was involving [the victim] in illegal activity and that illegal activity ultimately resulted in the death of [the victim]. Upon this Court's perspective, using your child in that manner is about as bad as it gets. It's pretty pathetic and totally reprehensible. You know, a child expects that parent will look after it because that parent is supposed to nurture and be mature and take care of the child, not lead it into the situation that this parent did.

The trial court determined, however, that evidence existed justifying the denial of alternative sentencing in the defendant's case. The trial court found that confinement was necessary to provide an effective deterrence to others likely to commit similar offenses. Tenn. Code Ann. § 40-35-103(1)(B). The trial court based its finding on the testimonies of Agent Adkins and Dr. Thomas Deering. Both Agent Adkins and Dr. Deering testified that Opana related deaths had increased in the state of Tennessee since approximately 2006-2007. Dr. Deering testified he personally witnessed a rise in deaths attributed to misuse of Opana, especially when combined with alcohol.

Next, the court concluded that "the defendant's crime was . . . motivated by desire to profit or gain from the criminal behavior." *Hooper*, 29 S.W.3d at 10-11. The court noted the defendant's purpose in engaging her daughter in the sale of Opana pills was to get gas money. The court also found the defendant "previously engaged in criminal conduct of the same type." *Id.* Relying on testimony from the sentencing hearing, as well as text messages from the defendant's phone, the trial court determined the defendant attempted to sell her Opana pills on at least one occasion prior to the incident resulting in the victim's death.

Finally, the trial court considered the defendant's lack of remorse and failure to accept responsibility for her actions. The court stated: "[The defendant] failed to accept responsibility for her actions." The court went on to explain, "that to me - - to this Court shows that there's no remorsefulness with regards to this. I think she's sorry that this happened. No question she misses her daughter. I'm not questioning that at all. But no remorsefulness for her part that it played in it in acceptance and responsibility."

Accordingly, the trial court did not abuse its discretion in imposing a sentence of confinement. The record reflects the trial court properly considered the relevant purposes and principles of Tennessee's sentencing statutes and imposed sentences within the applicable range for the defendant's Class C felony offense of voluntary manslaughter, Class C felony offense of possession of a schedule II drug, and Class D felony offense of child abuse. The trial court then made the requisite findings on the record in support of

its ruling, and denied the defendant's request for alternative sentencing. Accordingly, we affirm the sentencing imposed by the trial court.

## B. Defendant's Failure to Allocute

Next, the defendant argues that the trial court committed plain error by considering her failure to testify at the sentencing hearing in its decision to deny alternative sentencing. Relief based on plain error will not be granted unless the following requirements are satisfied:

    (a) the record clearly establishes what occurred in the trial court;
    (b) a clear and unequivocal rule of law was breached;
    (c) a substantial right of the accused was adversely affected;
    (d) the accused did not waive the right for tactical reasons; and
    (e) consideration of the error is "necessary to do substantial justice.

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). "Complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000). The defendant bears the burden of persuading the appellate court that the trial court committed plain error and that the error was of "such a great magnitude that it probably changed the outcome of the trial." *Id.* (quoting *Adkisson*, 899 S.W.2d at 642).

As previously noted, the trial court shall consider any statement the defendant wants to make on her own behalf about sentencing. Tenn. Code Ann. § 40-25-210(b)(7). Often referred to as allocution, this statement is "an unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending sentence." *State v. Thomas A. Isbell*, No. M2015-00587-CCA-R3-CD, 2016 WL 869437, at *6 (Tenn. Crim. App. Mar. 4, 2016)(quoting Black's Law Dictionary 75 (7th ed. 1999)). However, the privilege against self-incrimination applies to the penalty phase. *Id.* (quoting *Mitchell v. United States*, 526 U.S. 314, 328-29 (1998)). Thus, the trial court may not draw an adverse inference about the facts of the crime from the defendant's silence at the sentencing hearing. *Id.* Though, the trial court may rely on the defendant's lack of remorse or failure to accept responsibility in denying the defendant's request for an alternative sentence. *Id.* at 7.

While the trial court clearly considered the defendant's failure to accept responsibility and her lack of remorse for her contributions to the victim's death in not imposing alternative sentencing, the record does not support a conclusion that the trial court took into account the defendant's failure to allocate during the plea hearing.

- 11 -

Specifically, the trial court noted that the defendant's lack of honesty weighed against imposing an alternative sentence, stating:

> In this case, had [the defendant] just come clean and said "I messed up," this Court might be giving out a different type of manner regarding the sentence, but that didn't happen in this case. I've already gone over the statement she gave to the TBI and, of course, we know that they were misrepresented both times to some degree . . .
>
> . . . it really comes down to the fact that there was no honesty here at the end of the day, and there was no clarity, no light that was shone on the situation by the defendant. And that, to me—to this Court shows that there's no remorsefulness with regards to this . . .

Contrary to the defendant's claim, the above referenced comments do not support a finding that the trial court drew a negative inference from the defendant's silence about the facts of the case. Rather, the record indicates the trial court relied on the defendant's failure to accept responsibility and her lack of remorse in denying an alternative sentence. As such, the defendant has failed to show that a "clear and unequivocal rule of law was breached." *Adkisson*, 899 S.W.2d at 641-42. Because the defendant has not established all five factors necessary for plain error review, the defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
J. ROSS DYER, JUDGE

- 12 -