IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 16, 2018

## STATE OF TENNESSEE v. ASPYN RINER

**Appeal from the Circuit Court for Maury County**
No. 25529     Stella L. Hargrove, Judge

_____

## No. M2017-01839-CCA-R3-CD

_____

A Maury County Circuit Court Jury convicted the Appellant, Aspyn Riner, of aggravated perjury, a Class D felony, and the trial court sentenced her as a Range I, standard offender to two years, six months to be served as six months in confinement and the remainder on supervised probation. On appeal, the Appellant claims that the trial court erred by denying her requests for judicial diversion and full probation and by ordering that she serve four calendar months in confinement before being eligible to earn good time credits. The State acknowledges that the trial court could not preclude the Appellant from earning good time credits but argues that the court properly sentenced her in all other respects. We agree with the State. Accordingly, the trial court's denials of judicial diversion and full probation are affirmed, but the court's ordering four months of confinement before becoming eligible for good time credits is reversed. The case is remanded to the trial court for correction of the judgment to so reflect.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part, Case Remanded

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Brandon E. White (on appeal) and Travis B. Jones (at trial and on appeal), Columbia, Tennessee, for the appellant, Aspyn Riner.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Brent A. Cooper, District Attorney General; and Kyle Dodd, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

In February 2017, the Maury County Grand Jury indicted the Appellant for count one, aggravated perjury committed on January 13, 2017, and count two, aggravated perjury committed on January 23, 2017. The State proceeded to trial on count one, and the jury convicted the Appellant as charged of aggravated perjury. Although the Appellant does not contest the sufficiency of the evidence, we will summarize the proof presented at trial in order to address the issues raised by the Appellant.

Aaron Steel testified that he lived in Columbia with his parents and worked as a lineman for AT&T. In September or October 2015, the Appellant was working at Firehouse Subs, and Steel met her when he went into the restaurant to order lunch. They began dating in December 2015, and the Appellant told Steel she was pregnant in January 2016. The Appellant moved in with Steel and his parents in February 2016, and Steel thought he and the Appellant had a good relationship. Their baby girl was born in July 2016, and Steel was planning to marry the Appellant. However, by Christmas 2016, Steel had "started to see some rough patches" in their relationship.

Steel testified that on December 28, 2016, a female work associate sent him a Facebook message stating, "I hope you've had a Merry Christmas and a safe New Year. I know you got a new baby and [you] have two beautiful women." The Appellant saw the message and became very upset. The Appellant and Steel had a verbal argument, and the Appellant grabbed Steel by the throat while the Appellant was holding their baby. The Appellant put the baby in the crib and shoved Steel twice. Steel said that he "pushed her back off of me" and that he left his parents' house in his car.

Steel testified that when he returned to the house, the Appellant was getting into her car with the baby and a small bag of clothes. As she started to back out of the driveway, Steel hit her driver's door window with his open hand. He did not damage the window or his hand, and the Appellant left. However, a neighbor called the police. By the time the police arrived, the Appellant had returned to the house. The police talked with the Appellant and Steel, and the Appellant took the baby and went to stay with her father in Shelbyville.

Steel testified that on December 31, 2016, the Appellant invited him to her father's house for a New Year's Eve party. Everyone but Steel was drinking alcohol at the party. Steel asked the Appellant if he could take the baby back to his parents' house, and she said yes. Several minutes later, though, the Appellant told her father that Steel was taking her baby. Steel left the house with the baby and telephoned his mother, and his mother telephoned the police to report the incident. Steel met the police at a gas station, gave a statement, and returned to his parents' house. The next day, Steel and the Appellant met so he could return the baby to her.

Steel testified that on January 2, 2017, he worked from 7:00 a.m. to 3:30 p.m. and returned home. About 4:00 p.m., a police officer knocked on the door and showed him an ex parte order of protection that had been obtained by the Appellant. In the order, the Appellant alleged that during her relationship with Steel, he hit and choked her "to the point [she] blacked out"; forced her to do "sexual things," which resulted in her having "colon problems"; forced her to delete all of her social media, did not allow her to have any friends, and did not allow her to visit her family; threatened to kill her and take her daughter away; cursed at her, spit on her, and "slung" her to the ground; held her head down and shoved his penis into her mouth; "held his fingers down [her] throat"; "punched" her car window while she and their baby were in the car; and took her cellular telephone away from her and would not allow her to get a job. She also stated in the order that she had been hospitalized for anxiety caused by him. Steel acknowledged to the jury that he hit the Appellant's car window but denied her remaining allegations. He said that before the police officer arrived at his parents' home on January 2, the Appellant told him, "Things are going to change." Steel said the Appellant's statement "sounded almost like a threat of some sort."

Steel testified that the ex parte order of protection provided that he was to appear at a hearing in general sessions court on January 13, 2017. Prior to that date, he could not have any contact with the Appellant. Within an hour after being served with the ex parte order of protection, though, the Appellant began texting him. In the texts, which the State introduced into evidence at trial, the Appellant said that she planned "to drop all charges" and that all she wanted "was a restraining order against [Steel's] mom" for threatening to kill her. The Appellant told Steel not to respond to her texts because she did not want him to get into trouble. Steel stated that he did not respond to the Appellant, that he hired an attorney, and that he paid the attorney a $2,500 retainer fee.

Steel testified that he and the Appellant were present in general sessions court on January 13, 2017, and the State played an audio recording of the hearing for the jury. During the hearing, the Appellant testified under oath that she feared for her and her daughter's lives because the Appellant had been "physically abusive, sexually abusive, and mentally abusive." She stated that the Appellant had been mentally abusive throughout their entire relationship by calling her "fat ass," "lazy," "stupid," "worthless," "nasty whore," and "lesbian." He also told her that she "would have to be a certain way" when he got home from work or that she "would be punished." The general sessions court asked the Appellant what "a certain way" meant, and she answered, "By shoving his penis down my throat." She said he had been physically abusive by choking her until she blacked out; hitting her in the face; and holding a gun to her head. The Appellant also forced her to do "sexual things" she did not want to do, which caused anal bleeding; tried to shove his hand into her vagina, and repeatedly forced his penis down her throat.

She said she went to the emergency room on September 29, 2016, because of anal bleeding and that Steel drove her there. She stated that Steel bragged about having connections to "the cartel," that he said he would use his connections to get her killed, and that he said he could not wait to use his gun on someone. The Appellant said she left Steel on December 29, 2016, when he and his mother left the home, which gave her an opportunity to "escape."

Counsel for Steel cross-examined the Appellant about her claims and confronted her with the text messages she sent to Steel on January 2, 2017. The Appellant said she sent the messages because she "felt guilty" for obtaining the order of protection and did not want Steel to be kept from seeing their child. Counsel also confronted the Appellant with a November 16, 2016 text message in which she told Steel that he was "the perfect, loving, caring, most amazing father/lover ever." The Appellant acknowledged that she invited Steel to a New Year's Eve party on December 31, 2016, that he attended the party, and that he called the police. At that point, the general sessions court, clearly annoyed that the Appellant left Steel on December 29 but invited him to a party just two days later, dismissed the order.

When Steel's testimony before the jury resumed, he stated that he never forced the Appellant to delete her Facebook account or stop sending text messages, and he identified December 2016 Facebook messages she sent to him in which she suggested they delete their Facebook accounts. He described his sexual relationship with the Appellant as "[w]ild" and said she "always wanted to do deep throat stuff." He said he never forced the Appellant to do anything she did not want to do, and he identified numerous sexually explicit text messages exchanged between them. He said his mother never threatened the Appellant.

On cross-examination, Steel testified that he began dating the Appellant in August 2015, not December 2015. He said that his parents' bedroom was directly below his bedroom, that his parents "probably" heard him and the Appellant having sex, and that his mother told him one time to "keep it down." Steel said that he and the Appellant had verbal arguments but that he was not aggressive with her until he hit her car window on December 28, 2016. Steel denied drinking alcohol or smoking marijuana at the party on December 31, 2016. He said he used to smoke marijuana but "[n]ot anymore." He said he went to the party out of concern for his daughter's safety and to see where she was living.

Steel testified that during sex with the Appellant, he choked her "[u]pon her request" and that he had never "taken [it] too far." He said that at the time of their relationship, she was eighteen years old and weighed about 120 pounds and that he was twenty-five years old and weighed about 205 pounds. He said their sexual relationship

was a "mutual relationship," and he acknowledged that their sexual acts were not all her idea. He also acknowledged that he called the Appellant a "whore" and that she called him a "bitch" but said they commonly used such "verbiage" as a joke. Steel said that the Appellant never admitted to lying at the January 2013 hearing and that he was seeking permanent custody of their daughter.

Allison Steel, Aaron Steel's mother, testified that the Appellant moved into her home when the Appellant was four or five months pregnant. Aaron[1] and the Appellant loved each other and were playful with each other. However, they were still in the "immature stage" of their relationship and argued. Their bedroom was directly above Mrs. Steel's bedroom, but Mrs. Steel never heard them having sex. The Appellant confided in Mrs. Steel about her relationship with Aaron, and the Appellant never told Mrs. Steel anything disturbing. Mrs. Steel never saw Aaron act violently toward the Appellant.

Mrs. Steel testified that she had only one disagreement with the Appellant. She explained that one or two days before the Appellant moved out, she and the Appellant got into a "heated" argument. Aaron told Mrs. Steel that the Appellant wanted to fight her, and Mrs. Steel responded, "[T]hen let's take it outside because you are not going to act that way in my house." Mrs. Steel said that the argument did not escalate further but that "I was sure mad and I sure slammed a lot of doors and I stomped a lot." Mrs. Steel was present on January 2, 2017, when the police served Aaron with the ex parte order of protection. She said she read the order and was "[s]hocked." She stated that she saw Aaron hit the Appellant's car window on December 28, 2016, but that she never witnessed the other allegations in the order.

On cross-examination, Mrs. Steel acknowledged that she was not always present with Aaron and the Appellant. Defense counsel asked if she ever heard "crazy sex" upstairs, and she said no. At the conclusion of Mrs. Steel's testimony, the State rested its case.

The Appellant testified that she and Aaron Steel looked like "the perfect little family." However, he drank whiskey every day when he got home from work, and "[h]is drinking turned him into an abusive person." She said that Steel was "a very sexual person" and that he "forced himself on" her one time. He also liked anal sex and forced her to engage in it, and she went to the hospital emergency room due to anal bleeding. She said that she and Steel would "joke around" by calling each other names but that he was very "stern" with her. She also "was never really allowed to go see [her] family."

---

[1] Because Aaron Steel shares a surname with his mother, we will briefly refer to him by his first name for clarity. We mean no disrespect to Aaron Steel.

She stated that Steel never forcefully prevented her from seeing her family members but that he complained and "grip[ed]" to the point she would not see them. Steel also would not allow her to get a job or wear leggings. The Appellant acknowledged that she "[stood] behind" her allegations in the ex parte order of protection and her testimony in general sessions court.

On cross-examination, the Appellant acknowledged that she also was a "sexual person" but said that "[h]im more so than me." At first, the Appellant said she sent all of the sexually explicit messages on Facebook to Steel. However, she later said a friend sent some of the messages to him. The Appellant denied being "into" anal sex but said she was "into" choking during sex "maybe if it is lightly" and "with love." She then denied sending a Facebook message to Steel in which she said, "I want you here with your [d***] in my [a**] and hands on my throat." She said that although the message was sent to Steel from her Facebook account, her friend sent the message to him as a joke. She acknowledged suggesting to Steel that they delete their Facebook accounts and said she did so because they did not need the accounts. She also acknowledged that at the general sessions court hearing, she never disclaimed sending any of the text messages.

The Appellant acknowledged that while she was living with Steel, he worked and bought her a car. She said, though, that he would take the keys from her so that she could not go anywhere and that he would punish her if she did not obey him. He punished her by forcing her to have anal sex or by shoving his penis into her mouth. He also hit her and left bruises several times. The Appellant said she thought she wrote in the ex parte order of protection that Steel put a gun to her head. The State showed her the ex parte order, and she acknowledged that she did not mention any guns. She said she did not include all of her allegations in the order because "[t]here was so much stuff, I couldn't really clear my mind when I wrote that that day." She denied being intoxicated at the New Year's Eve party or allowing Steel to take the baby home with him. She said that the day after the party, Steel texted her, "I'm done with [the baby], you can come get her." The Appellant denied making up the allegations to "get a leg up" on the custody battle she knew was coming with Steel. She said that she did not leave Steel prior to December 28, 2016, because she wanted their family "to work" but acknowledged sending the following message to him on November 16, 2016: "Aaron Michael Steel, I love you with all my heart. I'm sorry I give you a hard time." On redirect examination, the Appellant testified that she said good things to Steel "[b]ecause everyone deserves positivity in their life."

Connie Ouellette testified on rebuttal for the State that her son and Aaron Steel were best friends and that she had known Steel about fourteen years. She said that Steel was "very truthful" and that she had never seen him intoxicated. On cross-examination,

Ouellette acknowledged that she did not know how Steel acted "behind closed doors" with a girlfriend.

Stanley England testified for the State that he was a lineman for AT&T, that he had known Aaron Steel's father "forever," and that he had known Aaron Steel for seven or eight years. He said that he had never seen Steel intoxicated or known Steel to tell a lie. England stated, "If a boss asks [Steel] a question, [Steel] tells him the truth, no matter what it is." On cross-examination, England acknowledged that he was good friends with Steel's father and that he did not know how Steel "acts behind closed doors in a relationship."

After the jury convicted the Appellant of aggravated perjury, the trial court scheduled a sentencing hearing. At the September 7, 2017 hearing, Aaron Steel testified that since the Appellant's trial, "[t]here's been two more [incidents]" and that "I have the text messages from those incidents." He said that in the first incident, the Appellant "was kind of leading into questioning about the baby having bruises" while the baby was in Steel's care. In the second incident, the Appellant allowed Steel to have the baby "outside the parenting plan" but then threatened to tell the sheriff's department he had kidnapped the child. Steel said that after the Appellant obtained the ex parte order of protection, he was placed on anxiety medication twice. He said he did not get to see the baby for three months even though he passed a drug test and the Appellant tested positive for cocaine. At the time of the sentencing hearing, their custody case was still pending.

Steel testified that "whenever [the Appellant] does something and she just gets away with it, it's worse on me and it grows, and grows, and grows. She feels as if she's invincible." He stated that the thought of the Appellant receiving judicial diversion was "scary" and that "if that happens, I'll pretty much be trapped in this evil downwards spiral of attacks and accusations that I don't think I could dodge forever. I mean, I feel like these attacks over, and over, and over, and over, I can't hardly keep my mind straight anymore." He said that he was having trouble keeping up with dates and work and that he was seeking psychotherapy.

Steel testified that he had to prove his innocence in general sessions court and again at the Appellant's trial and that the Appellant's actions had resulted in hospital bills, missed work, and the cost of hiring an attorney. He stated that the Appellant should have to serve her sentence in confinement in order to protect him from her and to show her that she could no longer lie and "abuse the system."

The State introduced the twenty-year-old Appellant's presentence report into evidence.[2] In the section of the report for a defendant's statement, the Appellant simply said, "Any of the evidence I had to prove I didn't lie was on a phone Aaron reported stolen." The presentence report showed that the Appellant had no prior criminal history and that she graduated from high school. The Appellant stated in the report that she attended some vocational and college classes but that she left school and decided to go to work when she became pregnant. In the report, the Appellant described her physical and mental health as "good" but said she suffered from anxiety. The Appellant reported that she tried cocaine and Xanax one time but "didn't like it" and that she used marijuana daily because it calmed her anxiety and helped her eat. The investigating officer asked if the Appellant could pass a drug screen, and she answered, "No. . . . I quit smoking almost a month ago but was a heavy user." The Appellant reported that she was a "social drinker" and that she and her daughter lived with her mother. Regarding her employment history, the Appellant stated that she worked for Firehouse Subs from July 2015 to February 2016 and Big Lots from February 2016 to July 2016. She said she left Big Lots for maternity leave and because her baby's father wanted her to stay home. The Appellant said she worked for Lewis Bakery from February 2017 to July 2017.

During the sentencing hearing, the trial court asked the Appellant if she could pass a marijuana screen, and she stated, "Possibly. I was a heavy smoker, though." She said she had not used marijuana since July. The trial court took a recess so that a drug screen could be administered. When the sentencing hearing resumed, the court was informed that the Appellant tested positive for marijuana.

The trial court noted that count two of the indictment was still pending, and the State responded, "Depending on the outcome of this sentencing hearing, I think Count Two can be resolved." The State advised the trial court that while the Tennessee Bureau of Investigation determined that the Appellant was eligible for judicial diversion, the State was opposed to judicial diversion. The State requested that the Appellant receive a three-year sentence with "some measure of jail time."

The trial court stated that it had considered the evidence presented at trial; Steel's testimony at the sentencing hearing; the presentence report; the general principles of sentencing; the arguments as to sentencing alternatives; the nature and characteristics of the criminal conduct involved; one mitigating factor proposed by the Appellant; statistical information provided by the Administrative Office of the Courts; "any allocution which Ms. Riner wishes to make, and it is my understanding through counsel that she does not wish to allocute"; and the Appellant's potential for rehabilitation or

---

[2] We note that the presentence report incorrectly states that the Appellant pled guilty to the offense.

treatment. In addressing the Appellant's request for judicial diversion, the trial court found that the Appellant's amenability to correction weighed against granting judicial diversion because she "thinks she's done nothing wrong and she can lie her way out of anything." The court found that the circumstances of the offense also weighed against granting judicial diversion. The trial court was particularly troubled by four statements made by the Appellant at trial: (1) that Steel held a gun to her head; (2) that Steel told her the day after the New Year's Eve party that she could have the baby because he was "done" with the baby; (3) that she did not make up the allegations against Steel in order to get a "leg up" on their upcoming custody battle; and (4) that her friend sent sexually explicit text messages to Steel. The court stated that the Appellant was "outright lying" when she made those statements.

The trial court found that the Appellant's lack of a criminal history and social history weighed in favor of granting judicial diversion. The court stated that the Appellant's physical and mental health weighed in favor of granting judicial diversion "I suppose" but that the Appellant just tested positive for marijuana and "talked about anxiety." The court concluded that the factor "has some weight for and against her." The court found that the deterrence value to the accused and others weighed against granting judicial diversion in that "we judges have an obligation there to somehow find a way to deter dishonesty when the stakes are high. Especially, as to custody issues out there." Finally, the court found that judicial diversion would not serve the interests of the public or the accused in this case. The court denied the Appellant's request for judicial diversion.

As to probation, the trial court stated that it did not know whether the Appellant would abide by the terms of probation because she had never served probation. The court addressed whether society needed to be protected from her future criminal conduct and stated, "I just know she was on trial for aggravated perjury and she lied when she was on trial for aggravated perjury." The court found that a sentence of full probation would depreciate the seriousness of the offense, stating that the court "was mainly concerned that Ms. Riner has no regard for the sacredness of the oath and can look at you square in the face and tell a lie." The court found that confinement was particularly suited to provide an effective deterrence to others because people needed to be deterred from lying under oath in order to gain a tactical advantage in a custody dispute. The court further stated that the Appellant had refused to accept any responsibility for the crime. The court denied the Appellant's request for full probation.

The trial court applied one mitigating factor, that the Appellant's criminal conduct neither caused nor threatened serious bodily injury, to her sentence. See Tenn. Code Ann. § 40-35-113(1). The court noted that the range of punishment was two to four years for a Class D felony and sentenced the Appellant to two years, six months to be

served as six months in jail and the remainder on supervised probation. See Tenn. Code Ann. § 40-35-112(a)(4). The court also ordered that the Appellant serve four of the six months before she could earn good time credits and that she pay $3,154 in restitution to Aaron Steel in payments of no less than $50 per month upon her release from jail.

## II. Analysis

### A. Judicial Diversion

The Appellant contends that the trial court erred by denying her request for judicial diversion. Pursuant to Tennessee Code Annotated section 40-35-313(a)(1)(B)(i)(a)-(e), a defendant is eligible for judicial diversion when he or she is found guilty or pleads guilty or nolo contendere to a Class C, D, or E felony; is not seeking deferral for an offense committed by an elected official; is not seeking deferral for a sexual offense; has not been convicted of a felony or a Class A misdemeanor previously and served a sentence of confinement; and has not been granted judicial diversion or pretrial diversion previously. Additionally, in determining whether to grant a defendant judicial diversion, the trial court must consider all of the following factors: (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the status of the defendant's physical and mental health, (6) the deterrence value to the defendant and others, and (7) whether judicial diversion will serve the interest of the public as well as the defendant. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (citing State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996)).

The record must reflect that the trial court has taken all of the factors into consideration, and "we may not revisit the issue if the record contains any substantial evidence supporting the trial court's decision." Id. Furthermore, "[t]he court must explain on the record why the defendant does not qualify under its analysis, and if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others." Id. When reviewing a trial court's decision to grant or deny judicial diversion, the standard of review is abuse of discretion with a presumption of reasonableness. State v. King, 432 S.W.3d 316, 327 (Tenn. 2014). However, if the trial court failed to weigh and consider the relevant factors, this court may conduct a de novo review or remand the case for reconsideration. Id. at 328.

The trial court found that the Appellant was not amenable to correction, stating that the Appellant did not think that she had done anything wrong and that she could "lie her way out of anything." We note that a defendant's lack of candor reflects poorly upon her amenability to correction. State v. Nunley, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999). The court also found that the circumstances of the offense weighed against her

- 10 -

due to four particular lies she told. The court noted that the Appellant did not have a criminal record, that her physical and mental health were good, and that she graduated from high school and attended some college. Nevertheless, the Appellant tested positive for marijuana at the hearing despite her claim that she had not smoked marijuana for more than one month. The court found the Petitioner not credible in that she lied in the general sessions court and then told the same lies at trial. Finally, the court stated that a party's lying in court to gain a tactical advantage over another party, particularly in a custody case, needed to be deterred and that the needs of the public and the Appellant would not be served by judicial diversion. The trial court considered and weighed all of the necessary factors before denying diversion and stated its reasons for denying diversion. Accordingly, we conclude that the trial court did not abuse its discretion by denying judicial diversion.

## B. Probation

The Appellant also contends that the trial court erred by denying her request for full probation because the State did not produce any evidence to rebut the presumption that she was a suitable candidate for full probation. The State argues that the trial court properly denied full probation. We agree with the State.

Appellate review of the length, range, or manner of service of a sentence imposed by the trial court is to be reviewed under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In sentencing a defendant, the trial court shall consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Appellant in her own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the Appellant to demonstrate the impropriety of her sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

An appellant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. See Tenn. Code Ann. § 40-35-303(a). The Appellant's sentence meets this requirement. Moreover, an appellant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. See Tenn. Code

Ann. § 40-35-102(6). As a Range I, standard offender convicted of a Class D felony, the Appellant is considered a favorable candidate for alternative sentencing. Tennessee Code Annotated section 40-35-103(1) sets forth the following sentencing considerations which are utilized in determining the appropriateness of alternative sentencing:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

See also State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). Additionally, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. § 40-35-103(5). A defendant with a long history of criminal conduct and "evincing failure of past efforts at rehabilitation" is presumed unsuitable for alternative sentencing. Tenn. Code Ann. § 40-35-102(5).

Turning to the instant case, confinement is not necessary to protect society from the Appellant, who has no history of criminal conduct. However, the trial court found that confinement was necessary to avoid depreciating the seriousness of the offense and particularly suited to provide an effective deterrence to others.

The Appellant argues that in order to deny full probation based upon the need to avoid depreciating the seriousness of the offense, the circumstances of the offense had to be "especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree." Previously, appellate courts stated that if the seriousness of the offense formed the sole basis for denying alternative sentencing, then the circumstances of the offense had to be "'especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree,' and the nature of the offense must outweigh all factors favoring a sentence other than confinement." State v. Trotter, 201 S.W.3d 651, 654 (Tenn. 2006) (quoting State v. Grissom, 956 S.W.2d 514, 520 (Tenn. Crim. App. 1997)). In this case, the seriousness of the offense was not the sole basis for the trial court's denying full probation. Regardless,

the Appellant falsely accused Steel, the father of her child, of horrific treatment, including holding a gun to her head and forcible oral, vaginal, and anal sex. Accordingly the trial court did not err.

The Appellant also contends that in order to deny full probation based on the need for deterrence, the trial court was required to consider the five-factor test set out in State v. Hooper, 29 S.W.3d 1, 6 (Tenn. 2000). However, "Hooper addresses the issue of whether deterrence alone may support a denial of alternative sentencing and articulates the criteria for such circumstances." Trotter, 201 S.W.3d at 656. Again, the need for deterrence was not the trial court's sole basis for denying full probation.

Finally, the Appellant contends that the trial court inferred from her silence at the sentencing hearing that she failed to accept responsibility for her crime. She also contends that the trial court's doing so violated Mitchell v. United States, 526 U.S. 314, 316-17 (1999), in which the United States Supreme Court held that a defendant retains a Fifth Amendment right to remain silent during sentencing and that a sentencing court may not draw an adverse inference about the facts of the crime from the defendant's silence.

This court has held that a defendant's failure to accept responsibility for the crime reflects poorly on the defendant's potential for rehabilitation. See State v. Dowdy, 894 S.W.2d 301, 306 (Tenn. Crim. App. 1994). At sentencing, the trial court explained as follows:

> Is there a failure to accept responsibility? Of course, I've heard throughout the trial that Mr. Steel is a bad person; he drinks too much; he holds a gun to my head; he's choking me, light choking okay, but he's choking me too much; [it's] my best friend; texting about sex, it's not me; he took my keys; he hit me a couple of time and left bruises; choked me to the point I blacked out. I have trouble with the credibility of Ms. Riner here.
>
> I don't see any acceptance of responsibility on the part of Ms. Riner. I just cannot see that.

Nothing indicates that that the trial court based its finding that the Appellant failed to accept responsibility for the crime on her failure to allocute or testify at the sentencing hearing. In any event, the Appellant gave a statement for the presentence report in which she essentially maintained that her allegations against Steel were true but that the evidence she needed to prove the allegations was on a telephone Steel had reported

stolen. See State v. Georgia Ann Tate, No. M2010-00979-CCA-R3-CD, 2012 WL 273659, at 6 (Tenn. Crim. App. at Nashville, Jan. 30, 2012) (citing to defendant's statement in the presentence report as failing to accept responsibility for her actions). We note that in pronouncing the Appellant's sentence, the trial court read the Appellant's statement from the presentence report aloud. Therefore, we conclude that the trial court did not abuse its discretion by denying the Appellant's request for full probation and by ordering that she serve six months in confinement.

### C. Good Time Credits

Finally, the Appellant contends that the trial court could not preclude her from earning good time credits. The State acknowledges that the court erred.

After the trial court pronounced the Appellant's two-year, six-month sentence to be served as six months in confinement, the court asked the prosecutor if he knew of any way a "day-for-day" sentence "can be upheld." The prosecutor advised the trial court that according to our supreme court's recent opinion in Ray v. Madison County, Tennessee, 536 S.W.3d 824, 838-39 (Tenn. 2017), "[o]n split confinement the Court has the -- the authority to fix a percentage that must be served before any good time credits can kick in." The trial court then ordered that the Appellant serve four of the six months in confinement before earning good time credits.

Under Tennessee Code Annotated section 41-2-111(b), a trial court cannot preclude a defendant from earning good time credits. Moreover, in Ray, our supreme court stated that for split confinement sentences, trial courts can fix a percentage that defendants must serve in actual confinement before becoming eligible to participate in a work program and earn work credits but cannot preclude defendants from earning good time credits under the statute. Ray, 536 S.W.3d at 838-39. Therefore, the portion of the Appellant's sentence in which she must serve four of the six months in confinement before earning good time credits must be reversed, and the case is remanded to the trial court for removal of that stipulation from the judgment form. [3]

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the trial court's denial of the Appellant's requests for judicial diversion and full probation but reverse the court's ordering that she serve four months in confinement before she is eligible to earn good

---

[3] The following statement appears in the Special Conditions box on the judgment form: "Defendant to serve 4 calendar months in jail before any good time credit pursuant to Jason Ray vs. State of TN."

- 14 -

time credits.  The case is remanded to the trial court for correction of the judgment to so reflect.

_____

NORMA MCGEE OGLE, JUDGE